**C.R.K., Plaintiff,**

v.

**U.S.D. 260; U.S.D. 260 Board of Education; Dr. Jim Sowers, Principal; Dr. Dennis Shoemaker, superintendent; Tim Aiken, President; Leslie Richards, Vice–President; Robert Hein, Mike Rosales, Carol Manning, Stan Singleton, Diana Praeger, Board Members; and Tom Young, Football Coach, Defendants.**

**No. 99–1301–WEB.**

United States District Court,
D. Kansas.

Nov. 9, 2001.

David O. Alegria, McCullough, Wareheim & LaBunker, P.A., Topeka, KA, for plaintiff.

M. Kathryn Webb, Scott E. Sanders, Richard W. James, McDonald, Tinker, Skaer, Quinn & Herrington, P.A., Wichita, KS, for defendants.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

Plaintiff C.R.K. was a tenth grade student at Derby High School in December of 1995 when she alleged that a former boyfriend, also a student at Derby High, had raped her in August 1995 prior to the start of the school year. In this action, plaintiff alleges that after she reported the incident, the defendants allowed the assailant and his friends to harass her during school

and extra-curricular activities, thereby violating plaintiff's rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. The matter is now before the court on the parties' cross-motions for summary judgment. The court heard oral arguments pertaining to the motions on October 15, 2001.

## I. *Facts.*

Prior to the arguments in this case, the court directed the parties to submit additional briefs containing a clear statement of the facts in chronological order. The defendant's supplemental brief complies with that order. The plaintiff's brief does not.[1] In keeping with the standards governing summary judgment, any facts in the parties' briefs not properly supported by the record have not been included in the following statement of facts. Any matters on which the record discloses a genuine dispute of fact have been construed in the plaintiffs' favor for purposes of determining whether the defendants are entitled to judgment as a matter of law.

In 1994–95, plaintiff was a fourteen year old ninth grade student at Derby High School. (She would enter tenth grade in the fall of 1995). Her boyfriend at the time, Adrian L. Martin, was then a sixteen year old tenth grade student at Derby High. Plaintiff alleges that she was sexually assaulted and raped by Martin on August 1, 1995. This incident occurred during the summer of 1995, prior to the beginning of the school year. It did not occur on school property.[2] Plaintiff did not tell anyone about the incident at the time. According to plaintiff, Martin threatened to kill her if she told her mother.

Defendant Dr. Sowers was the Derby High School Principal at all times relevant to this suit. In August of 1995, apparently after the school year began, plaintiff and her mother came to the office and complained to Dr. Sowers about an incident at a swim party in which some boys had been picking on plaintiff and were teasing and taunting her. The record does not disclose what the teasing was about, but it apparently had nothing to do with the incident involving Adrian Martin. Sowers had an assistance principal work to resolve the issue. The assistant principal contacted the parents of the boys involved and had a conference with the boys and their parents.

In the fall of 1995, after the date of the alleged assault but before plaintiff reported it, Ms. Sue Tanner, a teacher at Derby High, frequently saw plaintiff and Adrian Martin in a secluded area near her classroom with their arms around each other embracing. Plaintiff and Martin broke up

---

1. Due to the somewhat random arrangement of the facts in the initial briefs, the court requested additional briefs with the facts arranged in chronological order and containing a clear description of the complaints made to the school, the date or approximate date of the complaints, and a description of the response or determination made by the school regarding the complaints. The court also directed the parties to attach supporting documents to the extent their allegations were based upon underlying documents or letters. The court recognizes that an exact chronology would be impossible given the passage of time and the limited ability of witnesses to recall the date of events, but plaintiff's supplemental brief makes no apparent effort whatsoever to comply in any respect with the court's order. The lack of any order in plaintiff's 44–page statement of facts, when combined with the extensive argument interspersed with the facts, makes it difficult if not impossible to construct a coherent statement of facts from plaintiff's brief.

2. According to plaintiff's complaint, Martin initially drove her to a secluded spot on *school grounds and began undressing her before driving to another location where he committed the alleged sexual assault.*

and stopped seeing each other sometime in October of 1995.

In early December of 1995, plaintiff disclosed the alleged rape to one of her friends, who insisted that plaintiff tell her mother, which she did. Plaintiff and her mother contacted the Derby police about the incident in December of 1995. Some time thereafter in December of 1995, plaintiff's mother informed Ms. Steckel, Derby High School's cheerleading sponsor, of a police investigation of the incident and asked Ms. Steckel to watch the plaintiff so she would be safe. Plaintiff was a member of the school's junior varsity cheerleading squad.

Plaintiff's parents made an appointment with Dr. Sowers in January of 1996 and informed him of the alleged rape. They told him they had gone to the Derby police and were going to pursue criminal charges against Adrian Martin. Plaintiff's parents wanted an assurance from the school that Martin would not have any contact with their daughter and that supervision would be present during all practices. Plaintiff's mother told Sowers that Adrian Martin had recently followed plaintiff down the hallway at cheerleading practice.

Dr. Sowers subsequently talked with Ms. Steckel about the parents' concern. Ms. Steckel told him plaintiff's mother had already informed her of the problem. Sowers testified that because plaintiff was a Junior Varsity cheerleader and Adrian Martin was varsity cheerleader, the cheerleading sponsor made sure that no practices were scheduled that would include both of them. According to Sowers, they subsequently monitored the two students to make sure they were not left alone together at school without supervision.

Insofar as the allegation of rape was concerned, Sowers testified he did not believe it was the responsibility of the school at that point to discipline Adrian Martin or to conduct a hearing to investigate the allegations because the incident had occurred outside the school's jurisdiction and because it had been reported to the police and was the subject of a criminal investigation.

According to plaintiff, there were occasions around this time when Adrian Martin would stand outside the school gym waiting for her to come in the doorway and he would step in front of her and just stand there. He would also go get a drink when she did and things like that. Plaintiff did not report these incidents to the school; she would talk to her mom, and her mom would then talk to Dr. Sowers or to other school personnel.

On one occasion in January of February of 1996 when some of the other girls in cheerleading were giving plaintiff a hard time, Ms. Steckel told plaintiff that it was okay and that if plaintiff ever needed to talk to her, she could. Plaintiff informed Ms. Steckel about comments some of the other cheerleaders were making to the effect that she needed to drop what was going on and that she didn't have any right to be doing what she was to Adrian Martin. Plaintiff knew that Ms. Steckel thereafter talked to two of the girls, one of whom later came to plaintiff and apologized. Plaintiff testified she thought Ms. Steckel handled the matter appropriately. Two of the girls subsequently continued to make derogatory comments to plaintiff at school or on the bus, but plaintiff did not report these additional comments to Ms. Steckel.

In the spring of 1996, plaintiff talked to Mrs. Tanner, the school drama teacher, about participating in a school play. Plaintiff expressed interest in being a pre-play skit. Adrian Martin was also involved in the school play, although he was not involved in the pre-play skit. After plaintiff expressed interest in participating, plaintiff's mother contacted Mrs. Tanner and

asked who would be involved in the skit, explaining why she was concerned and informing Mrs. Tanner, at least to some extent, of the situation between plaintiff and Adrian Martin. Plaintiff's mother expressed concern for her daughter's safety. Mrs. Tanner felt like the pre-play skit would be appropriate in this regard because it was separate from the play itself. At some point plaintiff's mother requested permission from Mrs. Tanner to attend play practices so as to keep an eye on plaintiff, and Mrs. Tanner agreed to the request, although the record is not clear as to when this was done.

On one occasion, plaintiff was behind the stage making preparations for the play when she had to walk by students Adrienne Mae, Christie Carll, and Adrian Martin. Plaintiff had to say "excuse me," and Christie Carll and Adrian Martin moved out of the way. Adrienne Mae, however, stuck her foot out and acted like she was going to kick plaintiff. Upon seeing this, another student went and informed the teacher of Adrienne Mae's action. Mrs. Tanner went and got Adrienne Mae and the plaintiff together and talked to them about the incident. According to plaintiff, Mae said that plaintiff was just being paranoid and denied any wrongdoing, and then started yelling at plaintiff. Plaintiff testified that Mrs. Tanner just said to Mae that, "I thought you were going to be calm about this," and at that point Adrienne Mae walked away.

Plaintiff's mother contacted Dr. Sowers about the incident at the play. He immediately requested that plaintiff's parents come to his office. Plaintiff's mother went to the school that day and met with Dr. Sowers and explained what happened. Dr. Sowers also spoke with the plaintiff about the incident and assured her that it would not happen the next night at the play. No disciplinary action was taken against Adrienne Mae.

On March 8, 1996, students Adrienne Mae, Christie Carll, and Art Bellew followed plaintiff between classes. Plaintiff reported this to her English teacher, Ms. Harland. Ms. Harland got on the phone and called the administrative office to request that they send down a security guard. The security guard came down to the classroom sometime later and looked in the classroom. Class had already started. The students who had followed plaintiff were already gone at that point. The record does not disclose any further investigation or disciplinary action concerning this matter.

On March 14, 1996, during lunch period, plaintiff was eating lunch with another student when Christie Carll approached plaintiff and began yelling at her. According to plaintiff, Carll said she was "going to kick my ass ... if I didn't shut my mouth," and accused plaintiff of having called Carll and Adrienne Mae "liars" and having discussed the allegations against Adrian Martin with a third person. Plaintiff said Carll told her "if I was going to get a restraining order against Adrienne Mae, I better do it fast because they are getting ready to kick my ... ass," and then walked off. Plaintiff and her mother had talked about getting a restraining order after the incident at the school play. Plaintiff went directly from the lunch table where the above incident took place to the room of the mathematics teacher, Debbie Morris, and told her what had happened. Based on plaintiff's concerns, Ms. Morris immediately drafted an incident report and wrote down plaintiff's account of the incident so the situation could be dealt with properly. Ms. Morris also telephoned the office as was school policy and made sure that the plaintiff was accompanied to the office in order to inform the administration of the situation. After being escorted to the office, plaintiff met with Assistant Principal Gary Billy. Based upon plaintiff's com-

plaint, Mr. Billy gave Christie Carll a three day in-school suspension for harassment of the plaintiff. The suspension was served in the "A-room," or Alternative Classroom.[3] Mr. Billy arranged for a security guard to escort plaintiff from class to class for the rest of the day.

At some point in the Spring of 1996, Vice Principal Gary Billy asked a school security officer, Ms. Cindy Keen, to escort plaintiff to and from classes. There was a period of time where Ms. Keen escorted plaintiff to classes on a daily basis, although the record is unclear as to how long this went on. Plaintiff testified that she believes this was done shortly after the March 14th incident and that it was done in response to a request from her mother.

Sometime in early 1996, Dr. Sowers was told by the Derby police department that the District Attorney's office did not intend to pursue a criminal case against Adrian Martin. In March of 1996, plaintiff's mother talked to Sowers about her frustration with the legal process, the police, and the District Attorney's office. The District Attorney's office in fact subsequently filed a criminal complaint for battery against Martin in the Juvenile Department of the 18th Judicial District in Sedgwick County, although the record does not indicate when the complaint was filed.

It is undisputed that plaintiff's mother had numerous phone conversations during this period with Dr. Sowers and with other school personnel.

Sometime in the Spring of 1996, plaintiff complained that Adrian Martin had parked next to her in the school parking lot. She was concerned at the time because this meant that when she left school he might be right there. Either the plaintiff or someone on her behalf took photographs of the two cars next to each other. Sowers testified that upon inquiry about the incident, the plaintiff's mother said that plaintiff had parked there first but Adrian Martin said he had parked there first. Sowers said he went and looked at the security camera tape, but it did not show who parked there first. He took no further action.

On May 23, 1996, near the end of the school year, plaintiff's mother submitted three handwritten notes to Dr. Sowers. One note was for Dr. Sowers, one was "to go in Mr. Hearn's file," and one was "to go in Ms. Tanner's file." In her letter regarding Mr. Hearn, who was the school's vocal music instructor, plaintiff's mother complained of what she said was "unprofessional behavior" toward the plaintiff. She asserted that Mr. Hearn "had apparently made a judgement against my daughter, without having all the facts & refuses to speak to her." She stated that Mr. Hearn used to stop and say "hi" to the plaintiff in the hallway, but since the incident at the school play the plaintiff had spoken to Mr. Hearn on several occasions but he refused to acknowledge her. The letter concluded by stating, "When school starts next year, I expect Mr. Hearn to act in a professional manner towards my daughter." Dr. Sowers had the letter from plaintiffs' mother placed in Mr. Hearn's file. Dr. Sowers testified that he visited with Mr. Hearn after receiving this letter, and that Hearn said he had not done anything intentionally and had not realized there was a problem. Mr. Hearn testified at his deposition, however, that he had never been approached about this letter of complaint. He conceded that he had been "puzzled" by plaintiff's allegation of

---

**3.** Plaintiff contends this allegation is controverted because Dr. Sowers could not recall during his deposition whether any discipline had been imposed. The record makes clear, however, that Christie Carll was disciplined for the incident. *See* Def. Reply Exhs. C, F & G.

rape against Adrian Martin in 1996 because he had known Martin to be a model student, but denied ever having refused to speak to the plaintiff.

The March 23rd letter concerning Mrs. Tanner was placed in Mrs. Tanner's file. That letter complained, among other things, that Mrs. Tanner had been unprofessional by talking about the case with students and parents, and that students had told the plaintiff "they would get nothing done in drama because Mrs. Tanner was always talking about our legal action to her students." The letter concluded by saying, "When school starts next year, I expect Mrs. Tanner to act in a professional manner towards my daughter about the situation." Dr. Sowers spoke to Mrs. Tanner about this complaint. In response, Mrs. Tanner wrote a letter to Dr. Sowers setting forth her version of events. Among things, Tanner said that on the night of the play students had told her the plaintiff and her mother were "sharing their story with everyone" and this had gotten other students upset who "wanted nothing to do with all of this." She said the cast became upset and that everyone was crying or arguing. She said things then died down until the March 14th incident when many students were called into the office to give statements. She said at the beginning of fifth hour that day "there was a lot of confusion and concern expressed because many students felt they had been dragged into this situation." Mrs. Tanner said that "after about ten minutes, during which time the 'case' pending was never discussed.... I then told my class that I cared about them all a lot and I didn't want any of them to be hurt. However, this was a matter to be handled between [plaintiff] and Adrian. Therefore, I told them we would not discuss it again and we did not!" Mrs. Tanner stated that she was willing to treat plaintiff with the same care and concern she tried to share with all her students,

but said in return the plaintiff and her mother "should perhaps stop making accusations about me and my department that are absolutely without foundation." Based on this response, Dr. Sowers believed Mrs. Tanner had not done anything wrong and he did not reprimand her; he simply cautioned her against any discussion of plaintiff's legal action in class.

In the March 23rd letter from plaintiff's mother to Dr. Sowers, plaintiff's mother expressed her frustration at various things, including seeing her daughter, the victim, being "treated like she is the bad guy." She said that in the past she had worried about not making people mad but now she was going to fight for her daughter. She said they had had to put up with police detectives who were jerks and who had been chewed out by the District Attorney. She said that plaintiff "has put up with being threatened—both with death & bodily harm, yelled at, ignored & doubted by people who don't know the whole story" and that she "has endured this kind of behavior from students (some of which she doesn't even know) & from adults (teachers & administrators) who claim to be professionals." Plaintiff's mother stated that "I have listened to you express your concern that Adrian Martin get the education he has a right to. In my opinion, I don't care if he ever gets an education. I feel he should be kicked out of that school for his violent crimes." She also asserted that Martin should be declared ineligible for participation in all extracurricular activities based on the rules in the school district's Standards of Conduct for Athletic/Activity Participation, which said that a student who is under arrest, admits to, or is found guilty of any violation local, state or federal law would be ineligible. She said she had informed the District Attorney about the threats made by Adri Mae and Christie Carll, as well as about Mrs. Tanner talking to parents and students,

and said the D.A. was watching this case. She stated, "If you have a half hearted attitude about rape, then you think that we are only out to get Adrian, but if you see rape for the violent crime it is, then Adrian should be behind bars. I do hope you have as much sympathy for the victim [ ] as you seem to have for the rapist." She stated, "I don't care what you think of me because of my feelings about this. You don't speak to us when you see us anyway. (Unless we speak first.) But I have a right to my feelings & you can't judge me until you have walked in my shoes. You have been great about putting a stop to any threats [plaintiff] has had yes, but then you get this attitude like, stay away from me, I don't want anything to do with this." She closed by stating, "I don't know if you have a daughter, if so, maybe you can understand. I pray to God that your family is never put [through] the hell that my family is living."

Ms. Alana Pharis served as the Derby High School Athletic Director between 1994 and 1996. In October of 1994 she authored a report discussing the school handbook "Standards of Conduct for Athletic/Activity Participation." Under those standards, a student was ineligible for extracurricular activities if the student "is under arrest, admits to or is found guilty of any local, state or federal law (other than municipal curfew or traffic ordinances)." Pharis' report noted that the policy had been initially adopted in response to a student on an athletic team who was involved in a robbery/murder. The administration had attempted to bar the student from participating in athletics while he was awaiting trial, but a judge ruled that he could not be excluded, apparently because no standard to that effect had been adopted. The above rule was adopted as a result. In her 1994 interpretation of the rule, Pharis concluded that the language of the rule was too broad and too vague to be applied literally. She cited two former athletic directors who gave their opinion that the policy was only intended for severe cases and was intended to allow the administration to use its judgment taking into account the severity of the crime and all other circumstances. Pharis' 1994 report concluded that the rule was intended to give the school some authority as to who will represent the school but was not meant as a blanket policy for any violation of a local, state or federal law. Pharis states that in the Spring of 1996, she was involved in discussions regarding modifications to the policy and that the decision to modify the rule had nothing to do with any issues involving Adrian Martin.

According to the affidavit of Michael Redman, who was the Assistant Superintendent for Human Resources for USD 260 in 1996, changes to the Derby High School Student Handbook were routinely submitted to him in the spring of each year by various building principals for his review and evaluation. He then submitted proposed changes to the Board of education. In the Spring of 1996, Dr. Sowers presented a proposed rule change to Redman concerning the Standards of Conduct for Athletic/Activity Participation. The proposed new rule said a student would be ineligible when the "Student is under arrest, admits to, or is found guilty of violation of any felonious law." According to Redman, he approved the proposed change and presented it along with all changes requested by the various principals to the Board of Education on May 28, 1996.

The minutes of the Board of Education meeting of May 28, 1996, state in part: "SECONDARY STUDENT HANDBOOKS: Recommended changes to the 1996–97 secondary student handbooks will be brought back for action at the June 10 meeting." The June 10 minutes state in part: "SECONDARY STUDENT

HANDBOOKS: Mrs. Manning moved that the board approve [the] secondary student handbooks as presented by the administration. Mrs. Richards seconded the [motion], which carried unanimously." According to the affidavit of Michael Redman, the Board of Education approved all of the suggested changes.

In his deposition, Sowers testified that he thought the change in the language of the eligibility rule had been approved by the Board so he directed the printer to print new handbooks for the 1996–97 school year. At some point—the evidence cited does not show when—the Board of Education apparently asserted that it had not received the proposed rule change and had not adopted it.

On June 26, 1996, a hearing concerning the criminal complaint against Adrian Martin was held in the Juvenile Department of Sedgwick County before the Honorable Jennifer L. Jones. Adrian Martin, his parents, and his attorney were present, as were the plaintiff and her family. Others were present also, although no school representative was there. At the hearing, Adrian Martin admitted to the allegations in Count 1 of the complaint, which alleged the commission of a battery contrary to K.S.A. 21–3412(b), a class B person misdemeanor. When asked by the court what he did to commit the offense, Martin stated, "I touched [plaintiff] in a rude or insulting manner after she told me no." The judge thereafter found that the acts committed by Martin, if done by an adult, would have constituted the offense of Battery under K.S.A. 21–3412(b), a class B person misdemeanor[4], and determined that Martin was a juvenile offender as defined in the Kansas Juvenile Offender Code. Because Martin met the state's guidelines for "Initial Appearance Probation" and neither party objected, Judge Jones proceeded to disposition and placed Martin on one year of probation.

One of the conditions of probation was that Martin was to "have no contact, including written, verbal, face to face, or contact through a 3rd party with victim or victim's family." Another condition was that Martin was to be enrolled in school, to attend all classes, and to obtain a diploma.

In the course of the June 26 hearing, the judge reviewed the pre-disposition report prepared by a court services officer and made the following comments, among others, in connection with the sentence imposed:

Mr. Amons' [the court services officer] report indicates that basically this situation for which you are here before the Court arose out of what was once a friendly or consensual boyfriend/girlfriend-type relationship with the victim in this case but, as in many instances, deteriorated between you and her as well as your family and her family. The report indicates that you are currently attending Derby High School and the victim also attends that same school. Reports indicate that both of you are involved in some of the same activities, such as cheerleading and yell leading and some other extracurricular activities. * * * And there was some concern about your continuing to participate in certain school activities in which the victim is involved, particularly regarding the cheerleading and yell leading, and you [Martin] stated to him [Amons] your desire to be able to continue to do that as you hope to receive a scholarship to college based upon your yell leading.

\* \* \* \* \* \*

[Mr. Amons'] recommendation with respect to the victim's request that you not

---

4. K.S.A. Section 21–3412(2) defines battery as including "intentionally causing physical contact with another person when done in a rude, insulting or angry manner."

be allowed to participate in certain activities at school—his recommendation to the Court is that that be left to the discretion of the Court Service Officer, or your probation officer. And he also is recommending to the Court that there be a No Contact Order, which means that basically you, nor anyone one on your behalf or any of your family members or friends, would have any contact, either written, verbal or otherwise, with the victim or the victim's family in this case. And he's also requesting that the Court make that a mutual, or reciprocal, order so that the victim and her family also would not have the opportunity to do the same.

After hearing comments from the interested parties at the hearing, including the comments of Mr. Martin's attorney, who expressed concern over the practicality of enforcing the No Contact Order, the court added the following comments:

The State characterizes this as being a tumultuous-type situation, and I think that is, from what I have read, the very minimal way to describe this matter. Time will not allow me to say all that I think needs to be said in this matter to both sides, so let's just suffice it to say that whatever happened happened. Charges have been filed. The Respondent has been adjudicated on those charges, and the sentence that the Court is about to impose will be the sentence that will control in this case. Thus, now is the time for the healing process to begin. It will be imperative for both sides—in order for everyone, particularly the minors in this case, to move forward; to put this matter to rest after this proceeding today. I know that will be difficult for the victim; that she will have to live with what happened. But by the same token, Mr. Martin, I believe that there are things that happened that you will have to live with as well. * * * In that regard I think that that's one

area in which the No Contact Order should be and will be addressed. There have been allegations of family members, as well as the parties in this case, communicating with the other in the form of harassment or intimidation or stares or other persons on your behalf going around talking to other people. Whether that is true or not, the allegation has been made and this Court has to address it. When I mean a mutual No Contact Order I do not mean only by the two parties involved in this case, that also extends to their family members and their circle of friends. Mr. Swenson [Martin's counsel], I understand your concern about not having control over what friends do, but I think as long as there's continued discussion about this matter with friends or with your immediate acquaintances, as long as the families continue to discuss this issue with third parties that are not involved in the case, then that type of contact or harassment is going to continue. Thus, it would behoove all of us to stop those discussions outside of the therapeutic setting, and that's basically what I'm ordering in this case. I believe that Mr. Martin, you have some control, limited as it may be, over what your friends might do on your behalf thinking that they're helping you out. But I believe it is your responsibility to explain to them that it's your hide that's going to be on the line if they attempt any contact with the victim or her family in this case. Any if they're your friends they'll back off and honor your request.

\*　　\*　　\*　　\*　　\*　　\*

As far as the—as far as the ability for you to participate in extracurricular activities at school, this Court is not going to be in a position to babysit your every move. Understand that you are on probation. Understand any violations of the conditions of probation would result

in a probation violation being filed and you coming back to this Court for some other disposition. And I can assure you it would not be continued standard probation, at least not for the one year period of time. Therefore, I'm not going to attempt to restrict any of your activities in that regard. Certainly, from my reading of what's happened in this case, you all have managed in some way to continue to participate in the same activities yet without a great deal of disruption. And that's not to say that the Court is attempting to minimize what the victim feels as a disruption in this case. However, it's an issue that I think would more appropriately be addressed through the school and whatever their rules and regulations are about extracurricular activities. So I'm not going to tell you you can't play football or be on the yell team or—or whatever. If there's any further contact in violation of the No Contact Order, the school, or I'm sure the victim and her family, will report that to Mr. Amons and the Court can then address it at that time.

In response to a request for clarification from Mr. Martin's attorney that the No Contact Order was mutual, the Court added:

That is correct, and I—and I—I think everybody in here ought to be adult enough to understand what I'm saying. I read everybody's statements and the accusations flying back and forth that this mother's talking to that Pastor, or this parent is talking to that school personnel, that's got to stop is we're ever going to move on in this case. And that is what I'm talking about, and, yes, it goes to both sides.

The record is uncertain as to when, but clearly sometime during the summer of 1996 before the start of the school year, Alana Pharis determined that Adrian Martin was ineligible to participate in extra-

curricular activities because of his involvement in the juvenile court proceedings. According to Pharis' affidavit, she determined that Martin would be ineligible until additional facts were obtained from the court or others. She says she recognized that the Martins would likely appeal the decision and that additional information would be provided in the appeal process.

On July 16, 1996, Adrian Martin's parents wrote a letter to Dr. Sowers enclosing a copy of the Juvenile Court's journal entry. They noted some previous discussions regarding their son's eligibility to participate in extracurricular activities, and asked for a clarification of the policy as it applied to Martin's circumstances. They asked Sowers to consider, among other things, the fact that Adrian was an honor student and was active in sports, music, drama and other activities, and had no prior corrective actions for disciplinary matters.

When plaintiff's parents learned of the Martins' appeal, they hired a lawyer to write a letter to Dr. Sowers, on August 15, 1996, asserting that if Martin were allowed to participate in extracurricular activities it would force the plaintiff to have various forms of contact with her assailant. The letter argued that the school rule on eligibility required Martin's exclusion from extracurricular activities based on his conviction for violating the law. The lawyer also asked that if Sowers were going to exempt Martin from the rule, that plaintiff and her parents be allowed to have input into the decision and to provide Sowers with relevant information. Sowers testified that he did not give the plaintiff any further opportunity for input, as he felt he already knew the plaintiff's position and had the relevant information.

Prior to making his decision, Dr. Sowers contacted Chief Deputy District Attorney Douglas Roth, who was one of the prosecutors involved in the juvenile court case.

Sowers spoke with Roth about the school activities in which Adrian Martin might be allowed to participate in light of the "No Contact" provision of the Conditions of Probation. Roth told Sowers that in his opinion it was best to keep juveniles in extracurricular activities even after they had been in trouble. After weighing the information provided by Sowers, Roth told Sowers he did not think it would violate the No Contact order if Adrian Martin were allowed to play football. Sowers also received a letter from Joseph Amons, the court services (probation) officer assigned to Martin's case. Amons indicated that Martin had done well on probation and gave his opinion that excluding Martin from school-related activities would have a negative effect.

As was indicated above, the evidence cited in the record is confusing as to how and when the Board of Education approved the change in the district's eligibility rule. Sowers testified that he met twice with the Board in August of 1996 in informal sessions. By that time, Sowers was inclined to reverse the athletic director's ruling and to permit Adrian Martin to participate in extracurricular activities and he wanted to get some direction from the Board. During these sessions, Board members asked Sowers what was going on with Martin's case and Sowers explained his understanding that Martin had been convicted of misdemeanor battery, not rape, as well as the conditions of probation placed on Martin by the judge. He explained his view of the eligibility rule and the way he proposed to apply it. There was some discussion at these meetings about whether this was a new rule. According to the testimony of board member Michael Rosales, the Board specifically

asked Dr. Sowers about this because they wanted to make sure no policies were being changed just to benefit Adrian Martin or the football team or that would place the victim in harm's way. According to Rosales, Dr. Sowers "came to the board and advised that they were having—this situation had occurred, that the rule that was applied was a policy that had not been printed in the school handbook yet; it was making reference to the old policy. I think the one he had applied was the new policy that had been addressing the concerns that the—they had at the school, at the high school about it being unclear." Although the "old" rule said categorically that a conviction made a student ineligible, "we were advised by Dr. Sowers that that was not correct, that the new rule was in place. It had not been published. But they had approved the new rule already, that was what he was using." As the court understands the testimony cited by plaintiff, Sowers did not represent to the Board that it had already adopted the "new" rule (*see Rosales* depo. 11), but explained to the Board that he was applying an interpretation of the prior rule which permitted him to take into account the severity of the crime in determining whether a student should be ineligible because this was the intent of the rule (although not what the "old" rule in fact stated). Sowers indicated to the Board that this interpretation had not been adopted merely for Adrian Martin's benefit but had been suggested by the athletic director back in 1994 and had resulted in a proposed new rule in the spring of 1996. Sowers understood after his meetings with the Board that they were approving of his decision and his manner of applying the policy "as we had intended it to be."[5]

---

**5.** Plaintiff contends the testimony of Board member Michael Rosales shows that Sowers lied about the change in the eligibility rule and further contends that Sowers changed the

rule in the handbook "in an effort to cover his tracks." The evidence cited by plaintiff, however, does not prove that Sowers made any material misrepresentations to the Board or

Dr. Sowers said in his deposition he based his eligibility determination upon what he understood the juvenile court's findings to be—that Martin had committed a battery—as opposed to the allegation of rape that had been made by the plaintiff. Sowers did not believe that the conviction for misdemeanor battery warranted excluding Adrian Martin from all extracurricular activities.

On August 23, 1996, Dr. Sowers sent a letter to the parents of Adrian Martin stating in part:

Your letter of appeal was received by myself and I am acting upon the appeal at this time. The policy as stated in the 1995–96 handbook which was in effect at the time of the action states "any student will be ineligible to represent the school in any practice, performance, scheduled contest, program or trip when:

2. Student is under arrest, admits to or is found guilty of violation of an [sic] local, state or federal law (other than municipal curfew or traffic ordinances)." Ms. Pharis declared Adrian ineligible according to the guidelines that she administers. I am very supportive of her decision and believe that she followed the policy exactly as she should have administered it. I am supportive of this position but am waiving the ineligibility for the 1996–97 school year and will place Adrian on extended probation to run concurrent with the court provisions. Adrian will:

1. follow the rules of the school as they are printed.

2. shall have no contact, including written, verbal, face to face, or contact through a 3rd party with [plaintiff].

3. he will not be allowed to try out for yell leader. Since [plaintiff] is a cheerleader, his participation would be a direct violation of the no contact provision. If he violates any of the above provisions his ineligibility will be declared in effect throughout the remainder of this academic year. We want Adrian to live up to his responsibilities as outlined and wish him much success this year.

At some point, probably in the fall of 1996 after the new school year began, plaintiff's mother contacted the school's cheerleading sponsor to make sure they knew what was going on and to discuss travel arrangements, because cheerleaders typically rode on the same bus as football players during football season. Plaintiff's mother asked that other travel arrangements be made. The school accommodated the request, and arranged for the cheerleaders to travel in separate vans.

In August 1996, plaintiff asked the cheerleading sponsor if she could be placed in a different location in the cheerleading formation so that she "was standing in front of the band and not where any students could come down and say things to me." The cheerleading sponsor accommodated the request and moved plaintiff.

Plaintiff testified that in the fall of 1996, people were constantly making comments to her, including people she did not know, such as asking her if she was the one trying to get someone kicked off the team. After a while plaintiff just gave up on reporting these comments to the school because nothing was being done to stop it, and she told her mother not to make any more such reports or complaints.

Around September 12, 1996, plaintiff's mother contacted Doug Roth of the District Attorney's office after an incident at the Derby–Ark City football game. Dur-

that the Board did not understand the action Sowers was taking. At most, the evidence cited by plaintiff indicates some confusion over whether Sowers' liberal interpretation of the eligibility rule was a "new" rule or an "old" rule.

ing the game, plaintiff had been on the sidelines cheering and accidentally hit someone with one of her pom-poms. When she turned around, she saw that it was Adrian Martin. Plaintiff's mother also related an incident that happened prior to the start of football season at the school's public football scrimmage. On that occasion, Martin had walked onto the football field near the cheerleaders, including the plaintiff. Plaintiff's mother also contacted Martin's probation officer, Joseph Amons, about these incidents.[6] According to plaintiff's mother, Roth told her that the No Contact order meant it was Adrian's responsibility to stay away from the plaintiff, and that meant even if Martin saw plaintiff walking down the hallway at school he was to turn and go the other way. He said that if Dr. Sowers had any questions, to have him call. Neither the District Attorney nor the probation officer took any action to ask the juvenile court to review these matters. After speaking to Roth, plaintiff's mother phoned Dr. Sowers and talked to him about these incidents. According to plaintiff's mother, Sowers asked for Roth's phone number and indicated that he would call him.

Dr. Sowers testified that he had been at the public scrimmage and had seen the second incident that plaintiff's mother was talking about. His testimony was that Martin came out of the locker room and walked straight out to the middle of the field with another player, without stopping or talking to anyone. As for the Derby–Ark City football game, Sowers testified that he had been there but had not seen Martin and the plaintiff close together. Sowers apparently took no action with regard to either of these incidents. The

District Attorney and the probation officer likewise took no action with respect to Adrian Martin's probation.

Plaintiff testified that her mother had spoken to Tom Young, the coach of the Derby High football team, and he told her that Adrian had been instructed to "stand on the other side of team" during football games so that he would be away from the plaintiff. Despite this, plaintiff testified that Martin would come and stand behind her during football games.

On September 23, 1996, at a junior varsity football game, plaintiff was there to watch a girls' cheerleading clinic. Adrian Martin sat two rows above plaintiff. When plaintiff's parents appeared, Martin left. There is no evidence that this particular incident was reported to school officials.

On October 10, 1996, plaintiff's mother wrote Dr. Sowers a letter setting forth "what I feel is yet another violation, by Adrian Martin, of his No Contact Order." The letter described an incident in plaintiff's chemistry class on October 4th where Justin Carll, who was the brother of the girl previously suspended for threatening plaintiff, was telling other people in class that plaintiff was "fat," and was saying it loud enough on purpose so plaintiff could hear it. Plaintiff's mother stated, "I know it would be hard to prove but we know it did in fact come from Adrian [Martin]." She noted that Justin Carll was a friend of Adrian's, and that Adrian knew plaintiff was sensitive about being called fat. She said Justin Carll had been at the Derby High football game that evening and that she had Carll on videotape making comments about plaintiff to one of the cheer-

---

6. The judge in Adrian Martin's case informed plaintiff and her family at the June 1996 hearing that they could report any violations of the no-contact order to the probation officer. It is unclear whether plaintiff was also informed that under Kansas law she could, as the victim of the offense, file a report with the juvenile court describing an alleged violation of Martin's probation and request a hearing thereon. *See* K.S.A. 38–1666.

leaders. She said, "I'm asking you again, to put a stop to this harassment," and that, "I feel Adrian has repeatedly violated this No Contact Order and everyone keeps giving him another chance." She noted that plaintiff had not heard these comments since October 4th, but she wanted Sowers to be aware of them. In closing, she added that plaintiff had seen Adrienne Mae and her friends more often than she used to between second and third hour at the intersection of "M" and "N" halls, and asked Sowers to make security aware of this and to have them in the area at that time.

Dr. Sowers testified that he talked to Justin Carll about these allegations and that he denied them. Sowers also talked to the chemistry teacher, but the teacher had seen no evidence of the incident. Dr. Sowers testified that "it's hard to prove anything when it's a student against a student." No disciplinary action was taken against Carll.

Also on October 10, 1996, Sowers received a memo from Dennis Shoemaker, the Superintendent of USD 260. The memo is not in the record and it is difficult to ascertain exactly what it said. According to excerpts from Sowers' deposition, the memo instructed Sowers to apply the "old" eligibility rule to Adrian Martin's situation. Sowers testified that he did not do anything about this because the decision and the appeal had been decided in August, some six weeks earlier, and because he had not been instructed to change the policy retroactively or to reverse the decision.

On October 17, 1996, plaintiff's mother sent a letter to Dr. Sowers in regards to a National Honor Society meeting that had taken place on October 10th. The letter stated that plaintiff had walked into the meeting and had found herself in the same room with Adrian Martin, who was also at the meeting. The letter stated, "Since Adrian is not taking responsibility to make sure he is not where [plaintiff] is, I'm asking you again to keep Adrian away from [plaintiff]." In response to the complaint, Dr. Sowers talked to the sponsor of the organization, Mrs. Oliver. The testimony is unclear as to what specific steps were taken to prevent a reoccurrence; Dr. Sowers simply testified that he "shared the concern with the sponsor of the organization and I don't believe he (Adrian) attended anymore meetings."

On December 3, 1996, plaintiff filed a federal civil rights lawsuit against Adrian Martin based on the Violence Against Women Act. The parties make some reference to this lawsuit at various places in the record, although they do not discuss it in detail. The docket sheet indicates that among other relief the plaintiff sought an unspecified temporary restraining order and a preliminary injunction, and that a hearing was scheduled on these issues for December 19, 1996.

On December 16, 1996, plaintiff's mother wrote Dr. Sowers a letter to inform him of several things. First, she said she had been at the school for a pep assembly on December 5th, and as she was leaving she walked by Justin Carll, who called her a "bitch." She said she stopped and looked at him and he and his friends just laughed. Second, she said that on December 11th or 12th, plaintiff saw Adri Mae and five or six of her friends, and that Mae would say something and then her friends would all look at plaintiff, making plaintiff very uncomfortable. She asked Sowers to keep an eye on this situation, noting that because Adrienne Mae's mother was friends with Martin's mother she was probably aware that plaintiff was taking Adrian to federal court. The letter asked Sowers to make security aware before the December 19th court hearing and to have them keep an eye on plaintiff.

On December 17, 1996, Sowers sent the following memo to Assistant Principals, Security, and the Athletic Director:

As you have monitored the difficulties between [plaintiff], (junior) and Adrian Martin (senior) for the past almost year, I again ask that you be aware of any problems involving these two students. If either should report anything to you I would ask that you make me aware of this immediately. In correspondence received from [plaintiff's mother] to myself, dated December 16, 1996, she asks that you be made aware that a court appearance is scheduled for December 19, 1996, that may involve both students. She is concerned for [plaintiff's] well being. Please continue your vigilant effort that you have done in the past to make sure that [plaintiff] and Adrian go their separate ways at Derby High School in gaining their education. I would also ask that if you see any other students addressing [plaintiff] in a manner inconsistent with normal conduct please intercede as you feel appropriate and report the activity as I have requested.

With regard to the December 16th letter of plaintiff's mother and the incident with Justin Carll, Dr. Sowers testified that, "we asked, we looked around, we tried to find witnesses to substantiate it; we couldn't find anybody who could document it or not document it. It was her word against the student's word." No disciplinary action was taken against Carll.

A hearing was held on December 19, 1996, in plaintiff's federal case against Adrian Martin. The hearing was on a motion for preliminary injunction. The motion was apparently taken under advisement by the court, with no ruling issued.

On January 7, 1997, plaintiff's attorney served a notice and demand letter upon the defendant school district and Dr. Sowers individually. The letter alleged that USD 260 and Dr. Sowers had intentionally discriminated against plaintiff on account of sex in violation of Title IX. The letter alleged that Adrian Martin had harassed and threatened plaintiff in the fall of 1995, that plaintiff's parents reported the harassment to the school in December of 1995 and January of 1996, that they advised the school of additional instances of harassment since then and had asked the school to restrict Martin's access to plaintiff and to declare him ineligible for extracurricular activities, but the school declined to do so and changed the rules concerning eligibility to accommodate Martin, that the school failed to follow sexual harassment policy providing for a hearing on complaints made by students, that the school had failed to stop the harassment, and that the school "clearly sent the message to [plaintiff] and all of the female students at Derby High School that the males in school shall be accommodated and catered to whenever their rights conflict with the rights of female students." The letter attached a copy of plaintiff's federal complaint against Adrian Martin. In closing, the letter demanded that "you prevent Adrian Martin from being present in any room, hallway, field, or other school property or school event off campus when [plaintiff] is in that area" and demanded the payment of $100,000 in damages.

Plaintiff testified that on two or three occasions while she was cheering at basketball games in approximately February of 1997, Adrian Martin would come in the gym and sit behind her and talk about her loud enough so she could hear. He talked about how taking him to court was "bull shit" and was stupid. Plaintiff did not report these incidents; she testified that she would tell her mom, who would then talk to Ms. Sherwood, Ms. Pharis, or Cindy Keen, the security guard.

At a basketball game on February 4, 1997, Adrian Martin came in the gym and sat in the front row of the bleachers. Plaintiff's mother went out and found Alana Pharis, the athletic director, and told her where Adrian was sitting. Pharis said she would make him move and she had a police officer go tell Martin to move.

Plaintiff testified that on several occasions during the basketball season, when she would go to the restroom during the game, Adrian Martin's mother and grandmother would follow her into the restroom and then follow her back. Plaintiff testified that they did not use the restroom, but just stood there watching plaintiff as she washed her hands. Plaintiff testified that she had her mom talk to Ms. Sherwood or to Cindy about these incidents. Cindy Keen, the security guard, was present at some of the games. Additionally, police officers were always present at the games. Numerous school administrators were present at games as well.

During a pre-game routine at one game where the cheerleaders stood under the basketball goal for the national anthem and then waited for the team to come running out, Adrian Martin's father came and stood right behind plaintiff during the pre-game. Plaintiff's mother saw this and had a family friend go and stand by Mr. Martin while he was standing behind plaintiff. Martin left the gym as soon as they were done with the pre-game. He later came back and sat with his family, who always sat by the student section and by the cheerleaders.

Dr. Sowers testified that after receiving a report that Adrian Martin or his family would get close to the plaintiff during school activities, he had an assistant principal follow up and investigate it.

On March 29, 1997, plaintiff's mother wrote a letter to Dr. Sowers stating:

Dr. Sowers, [plaintiff] has told me a couple of time in which you would speak to her and she has felt forced to respond to you because you are the principal of the school.

I'm writing to ask you *not* to speak to [plaintiff]. Do not put [plaintiff] in a situation where she feels she is being forced to speak to you.

Dr. Sowers complied with the request and did not speak to plaintiff after that.

In his deposition, Dr. Sowers conceded that students at Derby High had been expelled in the past for committing battery. For example, he said this had been done in a case where two students had jumped another student, and where three students had instigated a fight in the school parking lot with non-students that resulted in charges being filed against both parties. He also conceded that a student had been expelled in the past for breaking school property, and that students had been suspended for incidents of vandalism at school. Sowers testified that he believed he could not expel or otherwise take action against Adrian Martin on account of his battery conviction because the battery occurred outside the jurisdiction of the school and occurred at a time when school was not in session. When asked why he did not stop the harassment of the plaintiff by suspending "somebody" to make an example of them, Sowers testified:

Well, I think you have to have definite proof that Mr. Martin was involved. I think—I think you have to look at the separation of his friends and him. A lot of things can be alleged to him, yes, he was involved, but I think there's a separation. And I think you have to find some factual basis to do something where I can distinguish what he did in order to go for a suspension or expulsion of Mr. Martin.

Plaintiff testified that she wanted to participate in the Drama Club and Students

Against Drunk Driving, but she did not do so because she did not want to be around Adrian Martin, who was a member of these clubs. Plaintiff did not inform school officials that she wanted to participate in these clubs.

## II. *Defendants' Motion for Summary Judgment.*

The defendants raise five arguments in support of their motion for summary judgment. First, they argue there is no evidence plaintiff was excluded from participation in, denied the benefits of, or discriminated against in her education at Derby High. Second, defendants argue there is no evidence they were deliberately indifferent to the alleged harassment of the plaintiff. Third, they argue there is no evidence that plaintiff's complaints were handled differently by school administrators on account of plaintiff's gender. Fourth, they argue that the individually-named defendants cannot be held personally liable under Title IX. And fifth, they argue that plaintiff's "notice of claim" under K.S.A. § 12–105b limits the amount of damages she can claim to $100,000.

The standards and procedures for summary judgment are well established and will not be fully repeated here. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In essence, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.* A disputed fact is "material" if it might affect the outcome of the suit under the governing law, and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. *Discussion.*

### A. *Title IX Standards.*

Title IX provides in part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). In *Davis v. Monroe County Bd. of Education,* 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999), the Supreme Court held that a school district that receives Title IX funds can be liable in a private action for damages under Title IX if the school is deliberately indifferent to known acts of student-on-student sexual harassment.

The standard adopted in *Davis* embodies numerous limitations. For one, liability is limited to circumstances where the school exercises substantial control over both the harasser and the context in which known harassment occurs. *Davis,* 526 U.S. at 645, 119 S.Ct. 1661. Also, *Davis* "does not mean that the recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." *Id.* at 648. *Davis* does not imply that schools must necessarily expel students who engage in sexual harassment or that victims of harassment have a right to make particular remedial demands. "In fact, ... courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id.* at 648, 119 S.Ct. 1661. Nor does liability turn upon whether the school has successfully remedied peer harassment. Rather, school officials will be deemed "deliberately indifferent" only where the school's response to the harassment "is clearly unreasonable in light of the known circumstances." *Id.*

■ *Davis* indicated that the discrimination prohibited by the statute is further defined by Title IX's goal of ensuring equal access to educational benefits and opportunities. In that regard, courts must bear in mind that schools are unlike adult workplaces and that children regularly interact in a manner that would be unacceptable among adults:

> It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender. Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.

*Id.* at 651–52.

In applying these standards to a motion to dismiss in the *Davis* case, the Supreme Court first found that the harassment alleged in that case, if true, was sufficiently severe, pervasive and offensive to constitute sex discrimination. The Court noted that the plaintiff had alleged repeated acts of harassment by a particular student over a five-month period including numerous acts of offensive touching and vulgar comments, and the school had received similar complaints from other students. The

Court also found that the plaintiff had alleged a concrete, negative effect on her education in that her grades declined as a result of the harassment. Finally, the Court said a finding of "deliberate indifference" could be shown by the allegation that the school board "made no effort whatsoever either to investigate or to put an end to the harassment" and had failed "to respond in any way over a period of five months to complaints of G.F.'s in-school misconduct from [plaintiff] and other female students."

B. *Application of Davis in the Instant Case.*

■ As an initial matter, there is a substantial threshold question in this case whether the alleged harassment of the plaintiff can be properly characterized as *sexual* harassment within the meaning and scope of Title IX. Plaintiff dismisses any such question, asserting that the harassment came in retaliation for plaintiff's pursuit of criminal charges of sexual misconduct and thus "was based on sex." Assuming this was in fact the motive behind the alleged harassment, it still is unclear whether *Davis* intended such retaliatory conduct—which was not sexual in nature and was not gender-based—to fall under the rubric of Title IX sexual harassment.[7] Assuming Title IX does apply to such allegations, however, the court concludes the evidence fails to show that the school was deliberately indifferent to the harassment. Unlike *Davis,* the school district in this case did not ignore the re-

---

**7.** Davis seemed to equate sexual harassment under Title IX with "gender-oriented conduct." *See Davis,* 526 U.S. at 651, 119 S.Ct. 1661. The alleged harassment of the plaintiff here was not based on gender, but was apparently done on account of plaintiff's pursuit of criminal charges against Adrian Martin. Plaintiff argues that such retaliation is sexual harassment under Title IX because analogous behavior is prohibited under Title VII dis-

crimination law. But Title VII, in addition to prohibiting discrimination on account of sex, includes an express "retaliation" provision making it unlawful to discriminate against an employee because of the employee's opposition to an unlawful employment practice. *See e.g.* 42 U.S.C. § 2000e–3(a). *Cf. Seamons v. Snow,* 84 F.3d 1226, 1233 (10th Cir.1996) (retaliatory hazing did not constitute sexual harassment under Title IX).

ports of harassment, but took numerous steps in an effort to address them. Although the school might have been more aggressive in investigating some of the reports, and one can debate the wisdom of waiving or changing rules to permit the perpetrator of a criminal offense to participate in extracurricular activities, for the reasons that follow the court cannot say the evidence would reasonably permit a finding of "deliberate indifference" under the *Davis* standard.

As an initial matter, the fact that the school never investigated or held hearings with respect to plaintiff's allegation of rape, and that the school accepted the judgment of the district court as embodying a judicial determination of the facts of the case, does not indicate deliberate indifference. When plaintiff first reported the alleged rape to the school in December of 1995, the matter had already been referred to the police and was the subject of a criminal investigation. The incident had taken place some four months earlier, did not take place on school grounds or at a school activity, and occurred when school was not in session. Under the circumstances, there was nothing unreasonable about Dr. Sowers' conclusion that the August 1st incident was out of the school's jurisdiction and was up to criminal justice authorities to investigate, to determine what happened, and to impose any appropriate punishment. Indeed, in January of 1996 all that plaintiff's parents requested of Dr. Sowers was for the school to keep an eye on plaintiff and to keep Adrian Martin away from her. The uncontroverted facts show the school made some efforts to do so by monitoring the two students to see that they were not together unsupervised. For example, Dr. Sowers spoke to the cheerleading sponsor, and the practice schedules were arranged to make sure Martin and the plaintiff did not have cheerleading practice at the same time.

When plaintiff or her mother subsequently reported incidents of harassment in the Spring of 1996, the defendants did not ignore the reports, but took some steps in an effort to address the problem. When the cheerleading sponsor was informed by plaintiff that girls were making derogatory comments, the sponsor spoke with the girls, one of whom apologized to plaintiff. Plaintiff did not report any more such comments to the school. Later, plaintiff's mother spoke to the drama teacher about concerns for plaintiff's safety while she was participating in the school play in view of the fact that Adrian Martin was also in the play. In response to these concerns, the drama teacher agreed to allow plaintiff's mother to be present at play practices to keep an eye on plaintiff. After a girl in the school play, Adrienne Mae, pretended like she was going to kick the plaintiff, the drama teacher brought plaintiff and Mae together and talked to them about it. The drama teacher testified she thought she had diffused the issue. When plaintiff's parents subsequently complained to Dr. Sowers about the incident, he held a conference with them and assured them it would not happen again. Although plaintiff characterizes these response as essentially "doing nothing," counseling or talking with students is a typical first step in addressing discipline problems, and given the nature of the reported incidents above the response was not "clearly unreasonable" in light of the circumstances known to the school.

Shortly after the incident at the play, plaintiff reported to a teacher that several students were following her between classes. The teacher informed the administrative office of the this complaint, and the office responded by sending a security guard to assist the plaintiff. On March 14th, there was a more serious incident when another student, Christie Carll, approached plaintiff in the school lunch room

and threatened her and her family. When this incident was reported to a teacher, the teacher reported it to the administrative office. An investigation was conducted and as a result of the incident Christie Carll was given a three-day in-school suspension. The school also provided a security guard to escort plaintiff to classes for the rest of that day, and subsequently provided a security guard escort on other occasions when plaintiff's mother requested it. This response does not evince deliberate indifference to harassment.

Plaintiff argues strenuously that Dr. Sowers' decision to restore Adrian Martin's eligibility is evidence of deliberate indifference because it forced plaintiff to have contact with Martin and "sent a message" to students that sexual harassment would not be punished. There are several reasons why the defendants' actions in this regard do not rise to the *Davis* standard of deliberate indifference. First, insofar as the change in the eligibility rule itself is concerned, it is uncontroverted that by 1994—prior to any incident involving the plaintiff—the school had received a recommendation from Alana Pharis that the rule be interpreted to allow school officials discretion in determining whether a particular conviction should make a student ineligible for all extracurricular activities. According to Ms. Pharis' testimony, this change in the rule was subsequently discussed and agreed to by school administrators in the Spring of 1996 (before Martin pled guilty) and had nothing to do with Adrian Martin's case. Although plaintiff argues the rule was changed only to benefit Martin and thus evinced an indifference to sexual harassment, the evidence shows Dr. Sowers had a pre-exist-ing basis for changing the rule that had nothing to do with Martin's case. Secondly, although plaintiff argues the school was obligated to treat Martin's criminal offense as a rape or at least as a sexual battery (and thus as a violation of the school's rules against sexual harassment), the offense to which Martin pleaded guilty in fact contained no element of sexual contact. Under the circumstances, the school was not clearly unreasonable in—as Dr. Sowers put it—"accepting the findings of the court" and treating the offense as consisting only of battery.[8] Third, although plaintiff points out that some students in the past had been expelled or suspended for committing battery at Derby High, no evidence is cited of a similar case where a student was suspended for a battery committed outside the jurisdiction of the school at a time when school was not in session. Dr. Sowers could reasonably draw a distinction between such offenses committed at school and those committed outside the school's jurisdiction. (As Dr. Sowers noted, if an incident happened outside the school's jurisdiction the school often would not know the facts and might be unaware of the pendency or result of any juvenile court proceedings.). Fourth, Dr. Sowers relied upon the recommendation of the district attorney and the probation officer in Adrian Martin's criminal case, both of whom recommended that Martin be allowed to participate in extracurricular activities. These officials were presumably better informed about the facts of Martin's offense than Dr. Sowers, and they were the ones charged by law with seeing that the court's no-contact order was enforced. It was not clearly un-

---

**8.** Plaintiff argues that Martin was necessarily guilty of sexual harassment because he committed "battery" and the school disciplinary code defined sexual harassment to include "sexual assault or battery." Contrary to plaintiff's suggestion, this provision cannot reasonably be read as treating every battery as a type of sexual harassment. Rather, it suggests that a "sexual assault" or "sexual battery"—i.e., an offense whose elements include inappropriate sexual contact—will be considered sexual harassment.

reasonable for Dr. Sowers to rely on their judgment that the conviction should not preclude Adrian Martin from extracurricular activities and that his participation would not violate the terms of the no-contact order. Finally, Dr. Sowers did not ignore the potential for contact between plaintiff and Martin resulting from his determination, but fashioned his ruling so that Martin was ineligible for yell leading (a restriction the juvenile court had declined to impose) and was otherwise prohibited from conduct that would violate the court's no-contact order. The foregoing indicates that the defendants had a reasonable basis for their decisions such that their actions do not rise to deliberate indifference under *Davis.*

Plaintiff or her mother reported several additional incidents to the school in the Fall of 1996 and the Spring of 1997. For example, plaintiff asked the cheerleading sponsor to change her spot in the cheerleading formation because people were making comments to her. The sponsor accommodated the request. In September 1996, plaintiff's mother reported to the district attorney and to Martin's probation officer, and subsequently to Dr. Sowers, that Martin had been so close to plaintiff at a football game that she inadvertently hit him with a pom-pom. Although she argued that Martin's conduct violated the court's no-contact order, there is no evidence that the district attorney or the probation officer recommended to the court or to Dr. Sowers that any action be taken based on the incident. She also reported that Martin had walked too close to plaintiff at a football scrimmage, but Dr. Sowers had seen the incident and believed it did not warrant any action. In October of 1996, plaintiff's mother reported to Dr. Sowers that Justin Carll had called plaintiff "fat" in class. She said she knew Adrian Martin was responsible for this incident, although she recognized this would be hard to prove. The record shows

that Dr. Sowers had the incident investigated, but concluded that without corroboration the incident could not be a basis for discipline against Justin Carll. Sowers also testified that he could not discipline Adrian Martin for incidents committed by other students without some proof of his involvement. The Supreme Court recognized in *Davis* that the deliberate indifference standard takes into account such constraints on school disciplinary authority. Thus, the failure to impose discipline on Adrian Martin for incidents in which the school had inadequate proof of his wrongdoing does not imply deliberate indifference. *See also Davis,* 526 U.S. at 652, 119 S.Ct. 1661 (not enough to show that plaintiff was teased or called offensive names). Plaintiff or her mother also reported several incidents at basketball games in the Spring of 1997 when they said Adrian Martin sat or stood close to the plaintiff. Again, there is no evidence that the district attorney or probation officer advised the school that the alleged conduct violated the no-contact order. And, although no disciplinary action was taken against Martin based on these allegations, the record shows the school made some attempt to address the problem by having a security guard or school administrator assist the plaintiff, such as by asking Martin to move when plaintiff requested it. Sowers testified that he also directed an assistant to investigate the allegation that Martin's parents or grandparents stood too close or followed plaintiff at basketball games, although the school took no further action in that regard. Given the school's lack of authority to discipline these individuals, however, and the fact that they were also subject to the court's no-contact order, it was not clearly unreasonable for the school to leave any issues about violation of the no-contact order by these individuals up to the probation officer or the court. *Cf. Davis,* 526 U.S. at 647, 119 S.Ct. 1661

(Title IX liability may occur where the harasser is under the school's disciplinary authority).

As was noted previously, the court does not mean to suggest that the school's response in this case was ideal or that reasonable persons could not differ as to how the matter should have been handled. But this was not a case, as *Davis* was, of a school making "no effort whatsoever either to investigate or to put an end to harassment." *Cf. Davis,* 526 U.S. at 654, 119 S.Ct. 1661. The school here made numerous efforts to address the problems reported to it. To some extent, those efforts were hampered by practical limitations on a school's ability to monitor hundreds, if not thousands, of students, and to make determinations about events occurring outside the view of school personnel. Compared with the criminal justice system, which has agencies and personnel whose sole purpose it is to investigate and adjudicate claims of wrongdoing, schools are poorly equipped to handle such tasks. But the Supreme Court admonished in *Davis* that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id.* at 648, 119 S.Ct. 1661. More to the point, to avoid liability under Title IX a school "must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Id.* at 649, 119 S.Ct. 1661. Notwithstanding plaintiff's contentions of shortcomings in defendants' handling of her complaints, the evidence cited by plaintiff fails to establish that the school's response was clearly unreasonable. Accordingly, the defendants are entitled to judgment as a matter of law on plaintiff's claim under Title IX.

■ In addition to the foregoing, the law is now clearly established that only Title IX grant recipients can be held liable for an alleged violation of Title IX and that individual employees of the grant recipient are not personally liable for the violation. Plaintiff's response does not take issue with defendants' allegation that USD 260 is the only recipient of Title IX funds among the named defendants. Accordingly, the court concludes that insofar as the complaint asserts claims against the defendants other than USD 260 in their individual capacities, those defendants are entitled to summary judgment on the claims against them. *See e.g., Soper v. Hoben,* 195 F.3d 845, 854 (6th Cir.1999); *Hartley v. Parnell,* 193 F.3d 1263, 1270 (11th Cir. 1999); *Kinman v. Omaha Public School Dist.,* 171 F.3d 607, 611 (8th Cir.1999).

In view of the court's determination on the above issues, the court need not address the remaining arguments raised by the defendants in their motion for summary judgment.

## IV. *Conclusion.*

The defendants' motion for summary judgment (Doc. 83) is hereby GRANTED. Plaintiff's motion for partial summary judgment (Doc. 85) is DENIED. Plaintiff's motion to strike defendants' reply or for leave to depose witnesses (Doc. 105) is DENIED. Plaintiff has not shown unfair surprise in the fact that defendant obtained affidavits from witnesses such as Doug Roth, nor has she shown cause why opposing affidavits could not have been obtained. The clerk is directed to enter a judgment of dismissal on the merits in favor of the defendants and against the plaintiff. IT IS SO ORDERED this day of November, 2001, at Wichita, Ks.