**Patricia Renee BURWELL, Plaintiff,**

v.

**PEKIN COMMUNITY HIGH SCHOOL DISTRICT 303, and Pekin Community High School Board of Education, Defendants.**

**No. 00–CV–2111.**

United States District Court,
C.D. Illinois,
Urbana Division.

Aug. 14, 2002.

Patricia C. Benassi, Esq., Athena M. Papchronis, Esq., Benassi & Benassi, P.C., Peoria, IL, for Plaintiff.

Christopher P. Ryan, Esq., Steven A. Wakeman, Esq., Kingery, Durree, Wakeman & Ryan, Peoria, IL, for Defendants.

### *ORDER*

McCUSKEY, District Judge.

This case is before this court for ruling on Defendants' Motion for Summary Judgment (# 103). This court has carefully reviewed the voluminous documents and arguments presented by the parties. The record shows that Plaintiff, Patricia Renee Burwell, was a senior at Pekin Community High School during the 1997–1998 school year and graduated in May 1998. Beginning in February 1998, Plaintiff reported that she was the victim of sexual harassment by male students at the school. Pekin High School administrators looked into these reports and concluded that no sexual harassment occurred. The administrators determined, instead, that there was a conflict between Plaintiff and her brother, Mark Burwell (Mark), on one side, and some male students at the school, including Nick Joesting, Rob Seaman, Jake Adkins, Scott Nunan, Derek Salisbury and Tim Sullivan, on the other side. The administrators took some action in an attempt to keep these two antagonistic groups separated from each other.

Plaintiff, and her family, were outraged that the administrators at the school did not take her reports more seriously and did not discipline the male students based on her reports. On September 14, 1999, Plaintiff filed her Complaint (# 1) against Defendants, Pekin Community High School District 303 and Pekin Community High School Board of Education. Plaintiff alleged that she was subjected to unwelcome sexual harassment that was so severe, pervasive and objectively offensive that she was deprived of access to educational opportunities and benefits. Plaintiff alleged that Defendants were therefore liable for intentional sexual harassment in violation of Title IX (20 U.S.C. § 1681 *et seq.*). Plaintiff also alleged that Defendants retaliated against her for her complaints of sexual harassment in violation of Title IX.

This court concludes that it is highly questionable whether the conduct reported by Plaintiff could be considered "sexual" harassment under Title IX. This court further concludes that there is no evidence that any sexual harassment suffered by Plaintiff was "so severe, pervasive, and objectively offensive, and so undermine[d] and detract[ed] from [Plaintiff's] educational experience, that [Plaintiff was] effectively denied equal access to [Defendants'] resources and opportunities." *See Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 651, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). The undisputed facts show that Plaintiff received her highest grades the second semester of her senior year of high school, was on the honor roll and graduated with her class in May 1998. Moreover, this court concludes that the administrators had information from a liaison police officer at the school, and other independent witnesses, which showed that some of Plaintiff's complaints may have been unfounded and which showed that Plaintiff and her brother may have had a role in instigating some of the conflicts. The administrators dealt with the reports, from both sides of the conflict, by attempting to keep the two sides separate from each other. This court concludes that the administrators' actions were not "clearly unreasonable" considering the information they had at the time. This court therefore concludes that it cannot say that Defendants were "deliberately indifferent" to Plaintiff's claims of sexual harassment. Accordingly, following this court's careful review of the record in this case, Defendants' Motion for Summary Judgment (# 103) is GRANTED. Because of this ruling, this court further concludes that

the remaining motions pending in this case are MOOT.

## FACTS [1]

As noted previously, Plaintiff was a senior at Pekin Community High School during the 1997–98 school year. Mark was also a senior at the high school. Plaintiff's mother, Patricia K. Burwell, was a teacher at the school. In 1997, she had taught at the high school for 29 years. During the 1997–98 school year, the administrators at the high school were: Ken Schwab, superintendent; Paula Davis, assistant superintendent; Tim Ruwe, principal; Joseph Schwalb, assistant principal; and Roger Fleisher, dean of students.

Plaintiff testified at her deposition that, toward the end of the first semester of the 1997–98 school year, some of the male students, including Joesting and Adkins, sometimes came over to the lunch table where she was sitting with Mark, Amy Behm, Ryan Weller, Nick Bockler and Ryan Carter. Plaintiff testified that Joesting and Adkins would yell "slut, bitch and pussies at us, and try to say that they wanted to fight us, and stuff like that." Plaintiff testified that the name-calling was directed toward Plaintiff and Behm. Plaintiff did not report this to anyone at the high school.[2] Plaintiff also testified that these male students were members of a gang known as the MOBs. MOB stood for Men Over Bitches or Money Over Bitches. According to Plaintiff, the MOBs congregated in an area known as the cove, which was located directly across from the school counselors' office. According to Defendants, there was an intramural basketball team at the high school called "M.O.B." The team used this name during the 1996–1997 school year. Ruwe, the principal, directed the team to change its name during the spring semester in 1998 when play began in late March. There was no team called "M.O.B." during the 1997–1998 school year.

On February 16, 1998, Mark was driving out of the parking lot, away from school. Mark testified that he was sitting at the stop sign waiting to pull out and Seaman ripped his door open. Mark stated that Seaman grabbed his arm and the steering wheel and tried to drag him out of the vehicle.[3] Mark gave him an elbow and pushed him away. Mark testified that Seaman did not say anything. The Chief

---

1. This court has attempted to include most of the incidents recited by Plaintiff in her Statement of Additional Undisputed Facts (# 121). However, this court has not included some of the incidents which did not involve Plaintiff. This court also has not included incidents which occurred after Plaintiff's graduation. In her Surreply (# 136), Plaintiff states that she is not relying on any conduct that occurred following her graduation from high school. This court notes that liability under Title IX is "limited to circumstances where the school exercises substantial control over both the harasser and the context in which known harassment occurs." See C.R.K. v. U.S.D. 260, 176 F.Supp.2d 1145, 1162 (D.Kan.2001), citing Davis, 526 U.S. at 645, 119 S.Ct. 1661.

2. Plaintiff's father, Dan Burwell, testified that he contacted Schwalb, the assistant principal, by telephone on February 4, 1998, and informed him that Plaintiff had reported that students known as MOBs were making verbal attacks on them. Burwell testified that Schwalb said he would take care of it. However, Schwalb testified that he had no contact with Burwell until March 1998.

3. This court notes that, in Plaintiff's Statement of Additional Undisputed Facts (# 121), she states that "Seaman grabbed the steering wheel and attempted to pull Mark out of his truck as it was moving." This court agrees with Defendants that this is a mischaracterization of Mark's testimony (and one which Plaintiff's counsel has persisted in making throughout these proceedings). Mark clearly testified that the incident occurred while he was sitting at a stop sign.

of the Park Police was in the parking lot and witnessed the incident. Mark at first declined to press criminal charges, but decided to press charges a few days later. Seaman was later interviewed about this incident and said that he went after Mark because he was told that Mark stole his lunch money. Mark testified at his deposition that Seaman "may have" thought he had stolen money from Seaman at lunch. Mark denied stealing any money from Seaman.

The next day, February 17, 1998, Plaintiff was in her publications class and was talking to another student about the attack on Mark. Joesting, who was also in the publications class, overheard her and said Seaman had done nothing wrong. Joesting and Plaintiff began arguing and Joesting asked Plaintiff if she wanted him to call her a slut. The teacher came into the room and told Joesting to quiet down. He told her he did not have to take that from an old lady, grabbed a pass from her and left the room. The teacher reported Joesting's conduct and he received a Saturday school detention as discipline.

On February 18, 1998, Plaintiff was driving through the parking lot with Behm. She heard Joesting yell slut. Plaintiff parked her car, and she and Behm walked over to where Joesting and a group of male students were gathered. According to Plaintiff, Joesting told her to hit him, and Plaintiff told him she was not going to fight him. Casey Whitley asked Joesting why he always picked on girls and Joesting replied that he wasn't, that Plaintiff and Behm wanted to fight him. As Plaintiff and Behm were walking away, Joesting said that Plaintiff was a pussy and was all talk. Jeffery Little, the campus liaison officer with the Pekin Police Department, was present to observe this incident. He saw Plaintiff get out of her car after driving over to the area where the students were gathered. Little also heard Plaintiff yelling at Joesting but did not hear Joesting yelling at Plaintiff. Little broke up the group of students. Little later told Ruwe what he observed.

On February 19, 1998, Plaintiff was walking down a school hallway when she saw Joesting, Nunan and Adkins behind her. They started yelling "hey, tough girl." Nunan and Adkins called her a pussy and asked why she didn't fight Joesting. Plaintiff testified that Nunan, Adkins and Joesting then surrounded her and were very close to her and "kept yelling at me and saying about fighting him, that I was a pussy and tough girl." Plaintiff's mother came down the hall and saw what was happening. She saw her daughter surrounded by three much larger male students. Plaintiff's mother told the students that an adult had witnessed their conduct. According to Plaintiff, the students then said "that there wasn't anything that could be done." Plaintiff told them she was going to report them to the police, and they said "yeah, right" and left before Plaintiff's mother could take their IDs. Plaintiff and her mother reported this incident to Little. Little arrested Joesting, Nunan and Adkins, removing them from their classrooms during school, in front of other students at the school. They were handcuffed and taken to the police station.[4] As Plaintiff left school after the arrests, two male students yelled out to her "you're a fucking bitch." Plaintiff and her mother reported this to the school office.

The morning of February 20, 1998, Plaintiff met with Little and provided information about what had been happening

---

4. The charges against Joesting, Nunan and Adkins were either not pursued by the Tazewell County State's Attorney's Office or, alternatively, the charges were dismissed by the State's Attorney.

at the school. Plaintiff, her mother and Behm also reported these incidents to the school. Whitley testified that he provided a report to the school regarding the February 18, 1998, incident. However, Whitley could not remember when he turned in the report, except that it was before graduation.[5] Little testified that, based upon his knowledge of the incidents, he concluded that "both sides were at fault" and that "there wasn't an innocent party between the two." Plaintiff also submitted a written report, dated February 20, 1998, which stated that, when she was leaving the counselors' office that day, Joesting, Seaman and some other male students walked by her and started yelling "MOB" over and over again. Seaman then said, "yeah, I'm in a gang." In her report, Plaintiff stated:

> Justin Carroll told me he thought this was all being blown up too much, but that they shouldn't be harassing me. He said there is no gang but that it is just the name of their basketball team.

On February 22, 1998, Plaintiff passed Adkins and Salisbury on her way to class. Salisbury said, "here comes [Plaintiff], you better be quiet and not say anything or you'll get arrested." According to Plaintiff, this incident was reported to the school. On February 23, 1998, Plaintiff had to make up a test before school started. While she was taking the test, Nunan came into the room and took a seat on the opposite side of the room to take his test. The teacher left the room for approximately five minutes to take a telephone call. During that time, Nunan stared at Plaintiff and was hitting his fist into his hand. He did not say anything to her. Later, in P.E. class, Nunan again glared at Plaintiff and hit his fist into the palm of his hand. Plaintiff submitted a written report about both incidents involving Nunan to the school.

Around that time, Plaintiff's mother met with Ruwe to talk about the problems Plaintiff and Mark were having at the school. On February 23, 1998, Plaintiff met with Schwalb. Schwalb told her to avoid the people giving her problems and, if they called her names, not to react to it. Schwalb testified that he probably said, "don't let them know that what you're hearing hurts you, to basically ignore it and in time it will go away." Schwalb stated that he had been giving this advice to students for over three decades. Schwalb also testified that this advice had always worked, except on two occasions, one of them being the situation with the Burwells.

On February 24, 1998, Ruwe sent a memo to Plaintiff's mother. Ruwe stated that he, Schwalb and Fleisher, the dean of students, were directing all parties involved to ignore one another. He stated that they had also instructed the students to report any problems to the administration immediately. He stated that the Pekin Police Department would continue to monitor the situation and "will continue to make arrests if necessary." Ruwe also stated that it was his position that "the consequence of arrest in the school and pending legal action will serve as the consequence for the behavior you reported to Officer Little." He stated that he felt "the boys were given a harsh consequence for their actions and that the consequence will promote a change in their behavior. Change in unwanted behavior is the ultimate goal of any disciplinary action, thus additional penalties are not necessary."

In response to Plaintiff's report regarding Nunan, Ruwe interviewed Nunan on February 25, 1998. Nunan denied any involvement. Ruwe told him to stay away from Plaintiff and to report any problems. Plaintiff's father, Dan Burwell (Burwell),

---

**5.** The school did not have a record of receiv-   ing Whitley's report.

testified that he met with Superintendent Schwab on February 27, 1998.[6] Schwab testified that he had no specific recollection of this meeting.

On March 3, 1998, Plaintiff was in her publications class. Joesting walked over to the door of the room where Plaintiff was working and started saying the names of male students at the school, who Plaintiff believed were members of the MOBs. Plaintiff felt threatened by this and turned in a written report about the incident to the dean's office. On March 5, 1998, when Plaintiff walked to her locker, Joesting, Nunan and Anthony Cates were standing near her locker. Plaintiff heard Cates say to Nunan "[i]t's a good thing you're in the MOB gang." Plaintiff turned in a written report about this incident to the dean's office.

On March 6, 1998, Burwell called Ruwe and told him that there had been two incidents on March 3 and March 5 and he "wanted something done before [Plaintiff] was seriously hurt or dead." A meeting was arranged and Burwell, Plaintiff, Ruwe and Schwalb met that morning at the school. At the meeting, Burwell said that he believed the treatment of Plaintiff was sexual harassment and he wanted his children protected. Ruwe said he would look into the matter and that Paula Davis, the assistant superintendent, would investigate Plaintiff's complaints. Ruwe explained that Davis was the school's sexual harassment officer.

Ruwe investigated Plaintiff's reports regarding the March 3 and March 5 incidents. He spoke to the teacher of the publications class, who informed him that she did not witness Joesting doing anything inappropriate in the class. Ruwe also spoke to Cates about Plaintiff's report that Cates made a statement relative to MOB. Cates denied this and said that Brent Smallwood, a security guard at the school, was present the entire time. Ruwe spoke to Smallwood who said he heard no exchange between Cates and Nunan. According to Ruwe, Smallwood also said that, if he had heard "MOB" he would have acted immediately because he was sensitive to the situation.

On March 10, 1998, Ruwe sent a letter to Burwell which stated that Davis would be conducting an investigation relative to the sexual harassment allegations. Ruwe also informed Burwell regarding the results of his investigation of the March 3 and March 5, 1998, incidents. In addition, Ruwe informed Burwell that no school consequence had been imposed on Seaman based upon the parking lot incident because Seaman had in fact been arrested, but Burwell and Mark elected not to pursue charges.

On March 17, 1998, Davis spoke to Plaintiff and Tonya Martin, who was in the publications class with Plaintiff on February 17, 1998. According to Plaintiff, she told Davis about everything that had happened up to that point. Davis concluded that there was no sexual harassment. On

---

**6.** Plaintiff has stated in her Statement of Additional Undisputed Facts that Schwab made a very insensitive statement to Burwell at this meeting. However, the pages of Burwell's deposition cited to support this statement of fact were not provided to this court, in violation of Rule 7.1(D)(2)(b)(4) of the Local Rules of the Central District of Illinois. This apparent oversight was pointed out by Defendants in their Response to Plaintiff's Statement of Additional Undisputed Facts. This court subsequently allowed Plaintiff to file a Surreply (# 136), a Reply to Defendants' Response to Plaintiff's Statement of Additional Undisputed Facts (# 137) and Exhibits in Support of Plaintiff's Surreply (# 138). Although Plaintiff stated in her Response (# 137) that the omitted pages were attached as Exhibit 5A, that was not the case. Because no support has been submitted for this statement of fact, this court will not consider it.

March 23, 1998, Burwell and Amy Behm's mother met with Davis. Behm's mother related incidents which occurred to Behm in January 1996, May 1997 and October 1997. These incidents did not involve the students Plaintiff had complained about.

Around this time, Burwell contacted three school board members, Nancy Wherry, Roy Culp and John Neumann, the president of the board. Burwell told them of his concerns about Plaintiff's safety. This matter was discussed at a school board meeting on March 23, 1998. Schwab and Ruwe told the board about the problems between Plaintiff and Mark and other students at the school and that Burwell and Plaintiff's mother were not satisfied with the school's handling of the matter. Schwab informed the board that there could be a potential problem because Burwell had told him he had been to see the Mayor and the Chief of Police.[7]

On March 25, 1998, Sullivan kicked and pounded Mark's car while Mark was stopped at a stop sign. Mark testified that Sullivan said the "MOBs are going to get you." Plaintiff was behind Mark in another car. As she drove up, she told Sullivan he better not touch the car again. Sullivan walked to the front of Plaintiff's car and yelled, "come on, come on, let's go." Plaintiff and Mark reported this incident to the school and the police department. Sullivan was arrested and was later convicted of criminal damage to property and ordered to make restitution in the amount of $500. Sullivan also had a disciplinary conference with Schwalb. Sullivan told Schwalb that Mark had swerved toward him in an attempt to hit him before he hit

Mark's car. Sullivan also reported that Plaintiff then called him a "fucking pussy." Three other male students, including Nunan, submitted written reports about this incident. These reports all stated that Mark swerved to hit Sullivan and that Plaintiff yelled profanities at them.

On March 26, 1998, Plaintiff was walking to her car in the faculty parking lot. She overheard someone say, "I am going to kill someone." She turned around and saw Joesting, Seaman and Salisbury looking at her. She asked what they were looking at and Joesting said, "why don't you just call the cops." Another student, Jared Barr, reported that he heard the word "kill." Plaintiff, Barr, Burwell and Mark reported this incident to Davis and Smallwood. Davis interviewed Barr regarding the incident. Davis also talked to Burwell. Davis testified at her deposition that Burwell asked her if any of the students were 18. He told Davis that it would be worth $1,000 to him to find out who was 18. Davis testified that this statement concerned her because she thought it meant that "he was going to take matters into his own hands" and was "some sort of threat."[8] Davis reported Burwell's comments to Schwab.

Ruwe interviewed Joesting, Salisbury, Seaman and Adkins about the reports and also talked to the parents of these students. In addition, the students wrote out written statements about the incident. The students consistently stated that, on March 26, 1998, Salisbury made a comment that Seaman was a "crazy" driver and something to the effect that he was

---

7. Schwab also stated that he had reason to believe that Plaintiff's mother had purchased cigarettes for minors. Schwab testified at his deposition that he had received a report that this was true. Plaintiff contends that this was a blatant attempt by Schwab to discredit Plaintiff's mother before the board.

8. Burwell testified at his deposition that he said to Davis that [he] was frustrated with the situation and that [he] would find out who was 18 and take care of it [himself] if it cost $1,000. He testified that he "was referring to legal fees, as [he] had already contacted attorneys about this matter."

"going to kill someone." They all said that they did not even know Plaintiff was there when this comment was made. In order to avoid further problems, Ruwe instructed Joesting, Seaman, Salisbury and Adkins that they had to leave the school using the west exit and that they were forbidden from parking in the faculty parking lot or being in that lot. They were also told they would be subject to suspension if they violated the restrictions. Seaman was given four hours of Saturday school detention for parking in the wrong lot on March 26, 1998.

On March 27, 1998, Kendra Draher turned in a report that she heard Joesting and several other male students say that something was going to happen to one of the Burwells in 5th hour. Draher also reported that she heard Scott Sumner yell "MOBs rule." At her deposition, taken on June 13, 2001, Draher testified that the report about Joesting was not true.[9] She testified that she wrote the report in Plaintiff's mother's class and gave the report to Plaintiff's mother. Draher testified that Burwell, Plaintiff and Plaintiff's mother encouraged her to embellish anything she wrote up.

That day, Schwab telephoned Burwell and asked for a meeting to discuss the problems that were occurring at the school. Schwab met with Burwell and proposed a solution to the problem which included restrictions on Plaintiff and Mark, as well as the restrictions which had previously been imposed on Joesting, Seaman, Salisbury and Adkins. Schwab testified that, because of Burwell's statement made the day before, he believed "there was some threat to the welfare and safety of students" and that "it was necessary to separate [Burwell] from our student body." Schwab testified that he told Burwell not to be on school property unless Burwell reviewed with him the way Burwell would come and pick up Plaintiff's mother. Burwell left before the meeting concluded. Burwell later called Schwab and left a message that Plaintiff and Mark would follow the restrictions if they were put in writing.

That afternoon, Draher was walking down the hallway. Seaman threw his bookbag up toward the ceiling. According to Draher's report to the school, the bookbag almost hit her. A teacher witnessed this incident and wrote a disciplinary referral on Seaman. Seaman received Saturday school detention based upon this incident. Draher testified that this incident had nothing to do with Plaintiff. Later that day, Plaintiff was assisting in her mother's classroom and saw that someone had written "Men Over Bitches, Fuck Them" on a desk. Plaintiff and her mother reported the incident. Fleisher took photographs of the desk and had the writing removed.

Plaintiff and Mark were called into Fleisher's office and were instructed regarding the restrictions. They were given a prescribed route to follow when entering the school at the beginning of the day and exiting at the end of the day. They were also told to only park in the faculty parking lot. In addition, they were told not to attend intramural basketball games, as they were not participants. According to Plaintiff, they were told that they had to leave school immediately after classes.[10] Plaintiff and Mark were given a copy of a

---

**9.** Plaintiff argues that Draher's deposition testimony that this incident and other incidents did not actually occur is not believable. Plaintiff contends that Draher is now antagonistic toward Mark based upon the fact that she was pregnant with Mark's child and Mark refused to marry her.

**10.** Defendants deny that this was one of the restrictions imposed. The written document given to Plaintiff and Mark did not include this restriction.

document setting out the restrictions. The document stated that they would be subject to a 10–day suspension for violation of the restrictions. The restrictions were placed in their disciplinary files.

That afternoon, Burwell came to the school to pick up Plaintiff's mother. Burwell was given the opportunity to leave and avoid arrest. He refused, and Little arrested him. Little then gave him a notice to appear and released him. Burwell later pleaded guilty to the charge and was given court supervision. Little testified that, after Burwell was arrested, Little saw Plaintiff drive around and pick up her mother. Little stated that Plaintiff was yelling profanities and said she would go down there and fight the boys herself. After that, Little observed Plaintiff and Mark drive around in the area, in violation of the restrictions imposed on them.

On March 28, 1998, Plaintiff's mother found the word "DIE" written on a desk in her classroom. She and Plaintiff reported this to the school. The graffiti was removed. On March 30, 1998, Mark told Smallwood that he had heard that Joesting and some other students were going to do something to his vehicle during 5th hour. Smallwood told Mark that, during 5th hour, Smallwood and Officer Little would be meeting with Joesting and the other students in question. Nothing happened to Mark's vehicle on that date.

On April 14, 1998, Plaintiff was driving home from the mall at approximately 9:00 p.m. The hood of the Jeep she was driving flew up and cracked the windshield.[11]

Plaintiff was able to drive the vehicle to the side of the road and was not injured. Plaintiff's mother wrote a written report which stated that Brandon Smith came up to Mark the next day and asked him how their Jeep was running. Mark told him that it was running fine and Smith responded, "Oh, I thought it was wrecked." Plaintiff's mother stated that this was suspicious because the accident had just occurred the night before and Plaintiff did not call anyone about it.[12] Behm testified at her deposition, taken on June 20, 2001,[13] that Plaintiff gave Plaintiff's friend "Buzz" a jump start that night, just prior to leaving the mall. Behm testified that Buzz opened the hood on Plaintiff's Jeep before the jump start, and Plaintiff forgot to relatch the hood. Behm testified that, after the accident and while they were sitting in the Jeep waiting for help, Plaintiff said she wanted Behm to say it was the MOBs that had done it. Behm testified that Plaintiff said she wanted to make up a big lie about the MOBs being there and that they had unlatched the hood.[14]

On April 20, 1998, Plaintiff's mother wrote a letter to the school board regarding allegations that she had provided alcohol to Plaintiff and another minor female student during a trip to St. Louis the previous year. In the letter, Plaintiff mother denied the allegations and stated that she believed that the student who made report fraternized with a gang, the MOBs. Plaintiff's mother stated that she believed the purpose of the charges against her was linked to the ongoing con-

---

**11.** Throughout these proceedings, Plaintiff's attorneys have insisted upon stating that the windshield of the Jeep was "shattered." Plaintiff testified at her deposition, taken on May 29, 2001, that the hood "cracked the windshield" and that "the glass was not shattered."

**12.** Defendants deny that they ever received this report.

**13.** At the time of the deposition, Behm's name was Amy Seward.

**14.** Plaintiff states that Behm's testimony about this incident is false. Plaintiff has not provided any reason Behm would have for testifying falsely.

flict between her family and the MOBs. No disciplinary action was taken against Plaintiff's mother based upon the student's report.

On April 21, 1998, Plaintiff was walking down the hallway at school and passed Adkins. Adkins said, "I've got a gun." According to Plaintiff, Adkins then looked Plaintiff straight in the eye and said, "you're gonna die." Plaintiff reported this incident to the Dean's office and the police department. In Plaintiff's report about this incident, Plaintiff also stated that "an 'MOB' member allegedly bragged throughout the school that he had lifted the latches on my Jeep's hood." Based upon Plaintiff's report, the school suspended Adkins for five days. Adkins was also arrested after his father brought him to the police station. After school that day, a male student told Mark that Plaintiff was a "stupid, fucking bitch." The student also said that the MOBs were going to get his mother fired and threatened to "kick [his] ass." Mark reported this incident.

On April 22, 1998, Joesting, Nunan and other male students called Plaintiff vulgar names and said she was a "fucking bitch." Plaintiff reported this incident to the Dean's office.[15] The same day, Plaintiff's mother reported that Joesting, Nunan, Adkins and other male students made "squawking" noises as she walked past them in the hallway. Ruwe talked to Joesting. Joesting said they were making "ape" noises and that the noises were not directed toward Plaintiff's mother. Later that day, Plaintiff saw Sullivan parking in the faculty lot. Plaintiff reported this to Fleisher and Schwalb. In fact, Sullivan was not one of the four students specifically directed to stay out of the faculty lot. However, Schwalb held a disciplinary conference with Sullivan as a result of Plaintiff's report. Schwalb then banned Sullivan from being in the faculty parking lot.

On April 30, 1998, Draher wrote up a report. Draher stated that, on April 29, 1998, she overheard three male students talk about how Plaintiff and Mark would be dead or seriously hurt within one month. Draher testified that she gave the report to either Plaintiff or Plaintiff's mother. The report was turned into the school, and Schwalb talked to the three students, all of whom denied making any such statements. Schwalb determined that Draher's report was not worthy of belief and that no further disciplinary action against the three boys was warranted. At her deposition, Draher testified that this incident did not happen.

Plaintiff wrote up a report, dated May 1, 1998, which stated that she heard Joesting bragging about driving his car where he was not supposed to under the restrictions imposed on him. According to Defendants, this report was not received by the school. On May 7, 1998, Plaintiff submitted a report which stated that a male student told Mark that Seaman and Justin Carroll were going to "kick their asses" at prom. In her report, Plaintiff stated that, because of this and other threats, she and Mark were now afraid to attend their senior prom.

On May 8, 1998, Plaintiff reported that, during her lunch period, she heard Joesting yell, "we rule Pekin, MOB." Schwalb investigated this report by talking to the lunchroom supervisors who were present and standing near Plaintiff and Mark. They told him that they heard nothing. Schwalb did, however, discuss it with Joesting. Joesting denied making any such comment. That afternoon, Plaintiff's mother moved a box in the hallway outside her room and saw that there was writing on the wall which stated, "Fuck the Burwells, MOB." She and Plaintiff reported this to the school. Schwalb had the writ-

---

15. Defendants deny that they received this report.

ing removed. Plaintiff also saw the word "MOB" written on the back of a desk in another teacher's classroom. Plaintiff reported this and the graffiti was removed from the desk.

On May 11, 1998, a report was submitted to the school. In the report, Draher stated that she overheard Joesting and other male students say "Fuck the Burwells. They are going down. Burwells are taking this too far and I'm going to do something about it, especially about [Plaintiff and Draher]." At her deposition, Draher testified that this report was made up. She testified that the only thing truthful about this report was that she did overhear the students say, "They are going down." Schwalb held disciplinary conferences with the students named in the report. Schwalb was unable to confirm Draher's report. In fact, one of the students named was not at school that day. Schwalb determined that no further discipline was warranted. An administrative meeting was held on May 13, 1998, and it was decided that Schwalb would monitor Plaintiff and Mark at the prom.

Plaintiff submitted a report on May 12, 1998, which stated that she was walking to her locker and saw Joesting walking in front of her. Joesting then said in a loud voice, "Yeah, Burwells say the school can't handle anything. They all need to grow up and quit taking this so far." He also said, "He needs to get his balls out of his purse and quit defending girls like he's in the third grade. I really want to kick their ass." Plaintiff reported that Smallwood was present and "there is no doubt that he heard the loud threats, insults, and degrading comments" made by Joesting. Schwalb and Ruwe held a conference with Smallwood and Joesting, Smallwood said he was present and did not hear any specific comment made by Joesting. Schwalb and Ruwe directed Joesting to keep his mouth shut.

In mid-May, 1998, a friend of Mark's, Dartanyon Baize, wrote some reports. These reports were submitted by Plaintiff as part of her exhibits in opposition to Defendants' Motion for Summary Judgment. The first report submitted is dated May 14, 1998, and May 15, 1998. In this report, Baize stated that "a couple of weeks ago Nick Joesting stated that he would (rape) [Plaintiff]." This report also included some other threats made, including one regarding Plaintiff and prom night. The second report was dated May 15, 1998, and stated that, on May 12, 1998, Joesting threatened to rape Plaintiff if he saw her by herself. Joesting also said that he would like to see her suffer by being raped by other MOB people. Another report, also dated May 15, 1998, stated that, on May 13, 1998, a male student stated that they were going to push and shove Plaintiff and Mark on prom night and that Joesting said the MOBs wanted to make senior year hell for Plaintiff and Mark. Other reports dated May 21, 1998, and May 28, 1998, stated that Joesting said he was going to do something to ruin graduation for Plaintiff and Mark and that Joesting also threatened to follow Draher to Mark's house after graduation. Defendants have no record of receiving any of these reports.

On August 25, 2001, Baize agreed to be interviewed by Davis, with his former soccer coach, Oz Bakirdan, present. Baize also agreed to have the interview tape-recorded. During this recorded interview, Baize stated that he wrote his reports at the Burwells' house and left them there. He stated that he honestly did not believe that he had turned them into the school. Plaintiff has submitted Baize's affidavit, dated October 14, 2001. In this affidavit, Baize stated that he took his reports to the dean's office. There is clearly a factual question regarding whether Baize's reports were, in fact, turned into the school.

However, it is undisputed that none of the threats written up by Baize was made in Plaintiff's presence.[16] It is also undisputed that neither Plaintiff nor anyone else in her family turned these reports into the school or did anything to follow up on Baize's reports.

On May 14, 1998, Burwell and Plaintiff's mother sent a letter to Schwab and the school board about sexual harassment toward Plaintiff and other female students. The letter was discussed at a school board meeting held on May 16, 1998. The minutes of the meeting state that Schwab informed the board that "the matter will not be taken lightly and that the police are fully aware of all incidents." In addition, the minutes also state that seating at graduation was discussed "in order to avoid any mishaps."

On May 16, 1998, Plaintiff and Mark attended their senior prom. The school hired extra security for the prom. In addition, Schwalb was present and watched Plaintiff and Mark the whole night. Plaintiff testified that Schwalb was near her the entire evening. Schwalb testified that he did not observe anything happen to Plaintiff. Draher testified that she was Mark's date at the prom and was near Mark and Plaintiff the whole night. She testified that she did not see anyone attempt to harm Plaintiff. Plaintiff submitted a report to the school, dated May 16, 1998. In this report, Plaintiff said that Seaman tried to run into her at the prom and knock her over. Her date, Geno, had to push Seaman away. According to Plaintiff's report, Mark told Schwalb what had happened.[17] Plaintiff also stated that, on May 18, 1998, Seaman was spreading

around school that he was going to "kick Geno's ass" because he stood up for Plaintiff. Schwalb did not investigate this incident because he personally had observed that nothing occurred at the prom.[18]

On May 22, 1998, Plaintiff observed Sullivan's vehicle in the faculty parking lot, which was a violation of the parking restrictions imposed on him. Plaintiff reported this to the dean's office. Schwalb testified that this report was not turned in until May 27, 1998. Schwalb took no action because classes were over for the school year and only finals remained.

On May 31, 1998, Plaintiff graduated from high school. Joesting was prohibited from attending graduation, and the graduation proceeded without incident. Plaintiff received the highest grades of her entire four years of high school during her last semester of high school, the second semester of the 1997–1998 school year. She achieved a 3.75 grade point average on a 4.0 scale and was on the honor roll. The record also shows that Plaintiff attended college following high school and was scheduled to graduate from the University of Illinois in Springfield the summer of 2002. It is undisputed that Plaintiff did not seek any medical treatment or counseling prior to her graduation from high school.

## ANALYSIS

### I. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

---

**16.** Plaintiff so testified.

**17.** Schwalb testified that, during the prom, Mark came up to him and said that Seaman was "jacking with Geno." Schwalb said that he never saw Seaman.

**18.** Defendants also state that the school's records show that this report was not turned into the school until May 27, 1998.

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any genuine issue as to any material fact that requires a trial. *See Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). A disputed fact is "material" if it might affect the outcome of the case under the governing law, and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *C.R.K. v. U.S.D. 260*, 176 F.Supp.2d 1145, 1162 (D.Kan.2001). Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, a plaintiff must respond to the defendant's motion with evidence setting forth specific facts showing that there is a genuine issue for trial. *Michael v. St. Joseph County*, 259 F.3d 842, 845 (7th Cir.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 2328, 153 L.Ed.2d 159 (2002). When ruling on a motion for summary judgment, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Speculation, however, is not the source of a reasonable inference. *See Chmiel v. JC Penney Life Ins. Co.*, 158 F.3d 966, 968 (7th Cir.1998) (noting that the court is not required to draw every conceivable inference from the record in favor of the non-movant, but only those inferences that are reasonable). To successfully oppose a motion for summary judgment, a plaintiff must do more than raise a "metaphysical doubt" as to the material facts, and instead must present definite, competent evidence to rebut the motion. *Michael*, 259 F.3d at 845.

## II.   TITLE IX CLAIM

■ Title IX prohibits gender-based discrimination in a wide array of programs and activities undertaken by educational institutions. *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65 (1st Cir.2002). It provides, in pertinent part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Discrimination "on the basis of sex" has been judicially interpreted to include sexual harassment. *Turner v. McQuarter*, 79 F.Supp.2d 911, 914 (N.D.Ill.1999). In *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999), the Supreme Court held that a school district that receives Title IX funds can be liable in a private action for damages under Title IX if the school is deliberately indifferent to known acts of student-on-student sexual harassment. *C.R.K.*, 176 F.Supp.2d at 1162. However, the Supreme Court stated:

> [F]unding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.

*Davis*, 526 U.S. at 650, 119 S.Ct. 1661. "The recipient is liable for damages only where the recipient itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to known acts of harassment." *Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th

Cir.2000), *citing Davis,* 526 U.S. at 642, 119 S.Ct. 1661. A response that is "clearly unreasonable in light of the known circumstances" constitutes deliberate indifference. *Davis,* 526 U.S. at 648–49, 119 S.Ct. 1661; *Landon v. Oswego Unit Sch. Dist. # 308,* 2001 WL 649560, at *5 (N.D.Ill. 2001). "[T]he deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Davis,* 526 U.S. at 645, 119 S.Ct. 1661. In addition, private damages actions against a funding recipient are limited to "cases having a systemic effect on educational programs or activities." *Davis,* 526 U.S. at 653, 119 S.Ct. 1661; *Saxe v. State Coll. Area Sch. Dist.,* 240 F.3d 200, 206 (3d Cir.2001).

Plaintiff claims that there are numerous disputed facts in this case so that summary judgment cannot be granted in favor of Defendants. This court agrees that there are many facts about which the parties do not agree. However, this court concludes that these factual disputes are not "material" or "genuine" because, even considering all of the facts in the light most favorable to Plaintiff, Plaintiff has not shown that there is a genuine issue which requires a trial.

█ As an initial matter, there is a substantial threshold question in this case whether the alleged harassment of Plaintiff can properly be characterized as *sexual* harassment within the meaning and scope of Title IX. *See C.R.K.,* 176 F.Supp.2d at 1163; *Manfredi v. Mount Vernon Bd. of Educ.,* 94 F.Supp.2d 447, 453–56 (S.D.N.Y.2000). In order to be actionable, the offensive behavior must be based on sex, rather than personal animus or other reasons. *See Frazier,* 276 F.3d at 66; *see also, e.g., Benjamin v. Metropolitan Sch. Dist. of Lawrence Township,* 2002 WL 977661, at *3 (S.D.Ind.2002).

It is undisputed that all of the conduct reported by Plaintiff was verbal, not physical. Plaintiff was not touched in any way by any of the male students she has accused of sexual harassment. The cases where student-on-student sexual harassment, in violation of Title IX, was found to exist involved much more egregious conduct than was reported in this case. *See Davis,* 526 U.S. at 633–35, 119 S.Ct. 1661 (over a period of five months, a fifth-grade male student harassed the plaintiff, a fifth-grade female student, by engaging in sexually suggestive behavior, including attempting to touch the plaintiff's breasts and genital area, rubbing against the plaintiff and making vulgar statements); *Vance,* 231 F.3d at 259 (female student was repeatedly propositioned, groped and threatened and was also stabbed in the hand; during one incident, two boys held her hands while other male students grabbed her hair and started yanking off her shirt); *Murrell v. School Dist. No. 1, Denver, Colo.,* 186 F.3d 1238 (10th Cir. 1999) (disabled female student was sexually assaulted by a male student on multiple occasions); *Snelling v. Fall Mountain Regional Sch. Dist.,* 2001 WL 276975 (D.N.H. 2001) (widespread peer harassment, both verbal and physical, which involved referring to the plaintiff as a homosexual, as well as some harassment by coaches).

Plaintiff claims that the evidence that she was called sexual names, such as bitch, pussy, and slut, shows that the harassment was based upon sex. Plaintiff states that she was called these names on a "daily" basis. There is no dispute, however, that Plaintiff did not report that she was called names on a daily basis. Plaintiff also argues that the reason the MOBs harassed her was because of her gender and because she did not conform to the MOBs' sex-based stereotypes of females. She further contends that the actions taken by the MOBs against Mark were based upon the fact that he stood up for her. This court concludes that there is little in the

record other than Plaintiff's speculative inferences regarding the male students' motivation to support this argument. This court notes that the first reported incident of conflict occurred between Mark and Seaman, possibly because of stolen lunch money. This incident preceded Plaintiff's run-in with Joesting in her publications class. This, and the fact that many of the reported threats were directed at both Plaintiff and Mark, undermines Plaintiff's claim that the harassment was based upon sex.

Plaintiff relies upon cases of employment discrimination under Title VII and argues that the use of gender-based terms "can be interpreted by a trier of fact as motivation and intent to discriminate on the basis of sex." However, the Supreme Court in *Davis* specifically stated that courts must bear in mind that schools are unlike adult workplaces and that children may regularly interact in ways that would be unacceptable among adults. *Davis*, 526 U.S. at 651, 119 S.Ct. 1661. The Court stated:

> It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and genderspecific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, *even where these comments target differences in gender.* Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.

*Davis*, 526 U.S. at 651–52, 119 S.Ct. 1661 (emphasis added). The Court went on to state it is not enough to show that a student has been teased or called offensive names. *Davis*, 526 U.S. at 652, 119 S.Ct.

1661. Following *Davis*, a court recognized that the use of terms such as "bitch," "whore" and "slut" at school are not necessarily based upon gender bias but may be based on personal animosity unrelated to gender. *See, e.g., Benjamin*, 2002 WL 977661, at *3–4.

Plaintiff also relies upon the reports written by Baize that Joesting made threats to rape Plaintiff. Plaintiff argues that this is evidence that the harassment of Plaintiff was based upon sex. As noted, there is some question regarding whether Baize's reports were turned into the school. Nevertheless, there is no dispute that Plaintiff was not present when any of the threats included in Baize's reports were made. This court concludes that two or three sexual threats, made outside of Plaintiff's presence, cannot be considered "severe, pervasive" sexual harassment. *See Wilson v. Beaumont Indep. Sch. Dist.*, 144 F.Supp.2d 690, 695 (E.D.Tex.2001) (nature of the harassment, including an alleged sexual assault, did not rise to the level found to be sufficient in any Title IX case).

Moreover, even assuming that the evidence was sufficient to show severe, pervasive and objectively offensive harassment based upon sex, this court concludes that Plaintiff has completely failed to show that she was deprived of educational opportunities or benefits or "equal access to education." Plaintiff testified that, because she had been instructed to leave immediately after school, she "couldn't go to the library after school if [she] needed to, [she] couldn't use the computers there, [she] couldn't see any teachers if she needed extra help" and could not be at the Tech Center. However, Plaintiff also testified that she had a computer at home and was not taking a computer class that semester. Plaintiff admitted that she could use the library and computer lab during school

hours. Further, it is undisputed that Plaintiff missed very little school that semester, took all of the classes she wanted and received her highest grades during this semester of high school.

Plaintiff argues that she was subjected to an "environment of terror" which had an "emotional and psychological impact on her education." Plaintiff notes that she has been diagnosed as suffering from post-traumatic stress disorder. This court recognizes that Plaintiff was upset about the conflicts she encountered during the second semester of the 1997–1998 school year. However, this court notes that the Supreme Court in *Davis* made clear that "a plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 651, 119 S.Ct. 1661. This court concludes that the evidence in this case falls far short of meeting this standard. The undisputed evidence shows that the harassment Plaintiff was subjected to during the second semester of the 1997–1998 school year did not "undermine" or "detract" from her educational experience. She was clearly able to obtain an education, as she was on the honor roll and graduated with her class. This court concludes that the evidence would not support a finding that Plaintiff was denied access to the school's educational program. *See Johnson v. Independent Sch. Dist. No. 47*, 194 F.Supp.2d 939, 946 (D.Minn.2002).

Plaintiff also argues that her education was impaired because she received a lower math grade during the first semester of the 1997–1998 school year because of the name-calling during her lunch hour. Plaintiff has supported this argument with her Affidavit, dated October 19, 2001. There is no dispute that Plaintiff made no reports to the school about any harassment before February 1998. Moreover, the Supreme Court in *Davis* stated that it did not contemplate, much less hold, that a mere decline in grades would be enough to survive a motion to dismiss in this type of Title IX case. *Davis*, 526 U.S. at 652, 119 S.Ct. 1661. The Supreme Court in *Davis* also specifically limited private damages actions under Title IX to "cases having a systemic effect on educational programs or activities." *Davis*, 526 U.S. at 653, 119 S.Ct. 1661; *Johnson*, 194 F.Supp.2d at 946. Plaintiff has not shown that she was deprived of any educational opportunities or benefits, let alone that there was a "systemic effect on educational programs or activities." Accordingly, Plaintiff is not entitled to damages under Title IX.

Finally, this court further concludes that, even accepting all of the evidence in the light most favorable to Plaintiff, the evidence does not show that the school administrators' actions were "clearly unreasonable" in light of the information they had at the time. Plaintiff concedes that "victims of peer harassment" do not have a "right to make particular remedial demands" and that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648, 119 S.Ct. 1661. Therefore, funding recipients, such as Defendants, can be "deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648, 119 S.Ct. 1661. The deliberate indifference standard is a high one. *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 384 (5th Cir.2000), *cert. denied*, 531 U.S. 1073, 121 S.Ct. 766, 148 L.Ed.2d 667 (2001). The deliberate indifference standard "does not mean that recipients can avoid liability only by purging their schools

of actionable peer harassment or that administrators must engage in particular disciplinary action." *Davis,* 526 U.S. at 648, 119 S.Ct. 1661; *Vance,* 231 F.3d at 260. Accordingly, officials may avoid liability under a deliberate indifference standard by responding reasonably to a risk of harm, even if the harm was not ultimately averted. *Doe,* 220 F.3d at 384. Whether an official's response to discrimination amounted to deliberate indifference may appropriately be determined on summary judgment. *See Davis,* 526 U.S. at 649, 119 S.Ct. 1661; *Doe,* 220 F.3d at 387.

In this case, the school administrators had information from Little, the school liaison police officer, Smallwood, a security guard at the school, and other witnesses such as teachers and lunchroom supervisors, that some of Plaintiff's reports were not accurate. In addition, Little had observed an incident where Plaintiff appeared to be the instigator of a conflict. Schwalb determined that two of Draher's reports were not credible, in one case because one of the accused students was not even in school the day of the reported conduct.[19] Schwalb also determined that Plaintiff's report that Seaman attempted to attack her at prom was not credible because he had watched Plaintiff the entire night and did not see anything occur. Nevertheless, school administrators did not ignore Plaintiff's reports. They had many discussions with the accused students and, on many occasions, advised the students to avoid Plaintiff and Mark and to stop making comments.[20] In response to Plaintiff's report of a very serious threat made by Adkins, Adkins was suspended for five days. In addition, school administrators imposed restrictions on parking spots and routes to and from school in an attempt to keep the students from having contact with each other. School administrators hired extra security for the prom, and Schwalb watched Plaintiff and Mark the entire night in an attempt to insure their safety. Seating at graduation was discussed at a school board meeting in order to avoid any problems. Based upon the information the school administrators had during the second semester of the 1997–1998 school year, after the reports began, this court cannot say that their response to the reports was "clearly unreasonable."

Plaintiff contends that school administrators should have thoroughly investigated every report she made, including the reports of offensive graffiti, and should have imposed discipline on the accused students based upon her reports.[21] Plaintiff takes great umbrage with Schwalb's testimony that he does not impose discipline based upon one student's report, if the accused student or students deny the accusations and there is no other corroboration of the report. Plaintiff strenuously contends that the administrators had no basis to disbelieve any of her reports because she was a good student, with an excellent discipline record, while the accused students, including Joesting, Seaman, Sullivan and Nunan, had abysmal disciplinary records at the school. Plaintiff insists that Defendants were deliberately indifferent because she was not interviewed regarding each of her reports.

---

19. As noted previously, Draher testified that these reports were not accurate.

20. It has recently been recognized that counseling or talking with students can be a reasonable step to take in addressing discipline problems. *See C.R.K.,* 176 F.Supp.2d at 1164.

21. This court notes that investigating Plaintiff's reports of offensive graffiti written on walls and desks would have been extremely difficult, if not impossible. There were no reports that anyone was ever seen writing the graffiti and, of course, numerous students had access to the walls and desks.

This court recognizes that, under some circumstances, the fact that school administrators did not interview a plaintiff to aid in the investigation can be an indication of deliberate indifference. *See Landon,* 2001 WL 649560, at *5. However, this court concludes that this was not a case where the school made no effort whatsoever to investigate or put an end to reported harassment. *See C.R.K.,* 176 F.Supp.2d at 1167, *citing Davis,* 526 U.S. at 654, 119 S.Ct. 1661. Plaintiff is essentially asking this court to "second guess" the school administrators' decisions. That is not this court's role. This court's role is to determine whether, based upon all of the facts presented in this case, there is a genuine issue of material fact regarding whether the school administrators' actions were clearly unreasonable. Based upon all of the facts presented here, and for the reasons stated, this court concludes that the evidence presented would not be sufficient for a trier of fact to conclude that the school administrators' actions were clearly unreasonable based upon the known circumstances.

This court concludes that, while Plaintiff and her family were thoroughly dissatisfied with the school administrators' actions and response to the reports of conflicts and harassment, there is no genuine issue of material fact which requires a trial in this case. *See C.R.K.,* 176 F.Supp.2d at 1167. This court wants to make clear that it is not making any credibility findings in reaching this conclusion. This court concludes that, accepting the facts in the light most favorable to Plaintiff, Plaintiff's Title IX case fails under the standard set out by the Supreme Court in *Davis.*

### III. TITLE IX RETALIATION

■ To state a claim for retaliation under Title IX, a plaintiff must allege that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse action; and (3) there is a causal link between the protected activity and the adverse action. *Landon,* 2001 WL 649560, at *6. In her Complaint (# 1), Plaintiff alleged that Defendants retaliated against her by preventing her from attending intramural games, by refusing to allow her to travel to and from school down certain streets and by monitoring her travels to and from school.

■ This court concludes that Plaintiff's retaliation claim fails because she has not shown that she suffered an "adverse action." The Seventh Circuit has noted on numerous occasions that not everything that makes a plaintiff unhappy is an actionable adverse action. *Hilt–Dyson v. City of Chicago,* 282 F.3d 456, 466 (7th Cir.2002); *Markel v. Board of Regents of Univ. of Wis. Sys.,* 276 F.3d 906, 911 (7th Cir.2002); *Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir.1996). The Seventh Circuit has stated that an adverse action is one that is materially adverse, "meaning more than a mere inconvenience or an alteration of job responsibilities." *Hilt–Dyson,* 282 F.3d at 465. A plaintiff must show that "material harm has resulted from ... the challenged actions." *Traylor v. Brown,* 295 F.3d 783, 788–89 (7th Cir. 2002), *quoting Haugerud v. Amery Sch. Dist.,* 259 F.3d 678, 692 (7th Cir.2001). The Court concluded in *Hilt–Dyson* that, because the plaintiff's complaints did not amount to an actionable adverse action, summary judgment was properly entered on her retaliation claim. *Hilt–Dyson,* 282 F.3d at 466. While *Hilt Dyson* involved Title VII retaliation, Plaintiff has argued in her Surreply that "[t]here is no reason for the law with respect to retaliation to be any different for Title IX than Title VII." This court agrees. *See Frazier,* 276 F.3d at 67 (the jurisprudence of Title VII supplies an applicable legal framework for a Title IX retaliation claim).

In this case, Plaintiff was prohibited from attending intramural basketball games, was required to park in the faculty parking lot, which was the lot she was using prior to the imposition of the restrictions, and was told to enter and exit the school using a prescribed route. Also, according to Plaintiff, she was required to leave the school immediately after classes were over. This court concludes that the imposition of these restrictions, which were identical to the restrictions imposed on Mark and similar to the restrictions imposed on other male students at the school, cannot be considered a material "adverse action" which would support a claim of retaliation. While the restrictions may have made Plaintiff unhappy and may have caused her some inconvenience, this court concludes that the restrictions did not cause "material harm." *See Haugerud*, 259 F.3d at 691–92. This court further concludes that the evidence would not support a finding that the restrictions on Plaintiff, which were also imposed on male students, were imposed in retaliation for her complaints of sexual harassment.

IT IS THEREFORE ORDERED THAT:

(1) Defendants' Motion for Summary Judgment (# 103) is GRANTED. Judgment is entered in favor of Defendants and against Plaintiff.

(2) This case is terminated. Therefore, the motions which remain pending in this case (# 105, # 113, # 132, # 133, # 134), all of which relate to the admissibility of evidence at trial, are MOOT.